## CHAS. P. JACKSON v. THE TEXAS COMPANY.

Middle Section.    June 1, 1929.

Petition for Certiorari denied by Supreme Court, December 21, 1929.

J. G. Stephenson and Harry A. Luck, of Nashville, for plaintiff in error, Jackson.

Keeble, Seay, Stockell & Keeble, of Nashville, for defendant in error, Texas Oil Co.

CROWNOVER, J. This action was brought by plaintiff in error Jackson to recover one hundred thousand dollars damages from The Texas Company for the wrongful termination of a contract of employment and the seizure of plaintiff's oil plant, storage tanks, warehouse and station facilities for the distribution of oils and gasoline about the City of Nashville.

The declaration contained five counts, which, when summarized, present two theories of liability:

(1) An action for damages for the wrongful discharge of the plaintiff prior to the termination of his verbal contract of employment for five years; and

(2) An action for damages for fraud and deceit, it being averred that the plaintiff was induced by fraud and deceit to enter into contracts of lease and license, by which contracts the defendant obtained possession of plaintiff's oil station and equipment.

The defendant filed three pleas to each of the counts in the declaration: (1) A plea of not guilty, (2) a plea of non assumpsit, and (3) a plea of the statute of frauds, that is, that the parol agreement for employment for five years averred in the declaration was violative of the fifth section of the statute of frauds.

The plaintiff filed a replication to the plea of the statute of frauds, to which the defendant demurred, which demurrer was overruled, and the defendant then joined issue on this plea. The court held that the statute of frauds did not apply.

The action was tried by the court and a jury, and an immense lot of proof was submitted. At the trial the defendant moved the court to require the plaintiff to elect which remedy he would rely upon—whether he would rely upon his counts for the breach of the oral contract of employment, or upon his count for damages for fraud and deceit, which motion was overruled by the court, and evidence was submitted on both theories; but at the close of all the evidence the court sustained a motion for peremptory instructions, and directed a verdict for the defendant. The plaintiff's motion for a new trial being overruled he has appealed in error, and has assigned twelve errors, which, when summarized, are that the court erred in directing a verdict for the defendant and in overruling the plaintiff's motion for a new trial because there were material issues that should have been submitted to the jury:

(1) As to whether defendant had a right to terminate the contract for any reason at the time and in the manner it did, and to seize and retain possession of plaintiff's property;

(2) As to whether defendant had waived or condoned the acts averred as a breach of said contract, or had waived its right to terminate the contract within a reasonable time after the discovery of the acts relied upon as a justification for the termination of said contract;

(3) As to whether defendant had entered into the lease and license contracts in good faith, and whether the reasons assigned by defendant for discharge of the plaintiff and terminating the contract of employment were false, fraudulent and corrupt and for the sole purpose of depriving plaintiff of his property and business.

(4) As to plaintiff's right to recover the price of gasoline that had evaporated in handling withheld from him.

The facts necessary to be stated are that the plaintiff Chas. P. Jackson owned a gasoline storage plant, tanks, warehouse, trucks, and equipment, located between Twenty-fourth and Twenty-fifth Avenues on the Charlotte Pike in Nashville, for the distribution of oils and gasoline in wholesale quantities, and had built up a trade in the sale of oil and gasoline about Nashville, Tennessee.

He at first bought his gasoline from independent refiners on sight draft, with bill of lading attached, but the business was not satisfactory, and he sought a connection with defendant, The Texas Company, and on August 25, 1924 he entered into a commission agency contract in writing with that company by which he was authorized to sell oils and gasoline on a commission basis, and was to receive three cents on each gallon of gasoline and other definite sums on oils sold by him. He operated under this contract until December 15, 1924, when he and the company entered into another agency contract similar to the first by which he was to receive only two and three-fourths cents on each gallon of gasoline sold by him. He operated under this contract until April 28, 1925, when another agency contract on a commission basis was made to become effective May 1, 1925, and he was to receive only two and one-half cents on each gallon of gasoline and other definite stated commissions on oils sold by him.

In this agency contract it was provided among other things that the agent bound himself to:

(1) "Strictly observe and obey the company's instructions and faithfully perform all duties connected with his employment."

(5) "Not to use the company's goods or funds in any way for private purposes and to not cash out of the company's funds personal checks for customers or other persons."

The contract further provided, in clause 7 "The company, at will and with or without cause, has a right to terminate employment."

It was understood by Jackson that credits were to be approved by The Texas Company and all cash receipts were to be deposited in bank subject to check of the Atlanta office of The Texas Company. Also that all gasoline or oils disposed of were to be represented by cash, or charge tickets turned in to the company.

It was Jackson's duty to make a charge ticket against himself each day for any stock he sold to himself, and forward it to Atlanta with all other charge tickets. The bills to credit customers were mailed direct to the customer from the Atlanta office each month, so that any withdrawals from stock for his personal use could be charged to him and deducted from his commissions at the end of each month.

All sales tickets were executed in quadruplicate. The first copy was to go to the customer, the next two were to go to the Atlanta office and the fourth copy to be kept in the local agent or district office as a record of that office, for auditing purposes, and all tickets, whether cash or credit tickets were checked by the auditor against the physical invoice of stock on hand when the station was audited by the company's traveling auditor about twice each year.

It was necessary to balance the amount of the gasoline or oil in stock with these cash and credit tickets.

After the plaintiff had operated under this last contract for sometime during the summer of 1925, the defendant company sent a representative to see the plaintiff about leasing this warehouse and storage plant to the defendant for a term of years—and he stated to the plaintiff that the company desired to make a more permanent arrangement for the distribution of its products in Nashville, and he proposed taking a five year lease on this property for a rental of a certain sum each month. He also proposed to retain Jackson as the company's Nashville representative or commission agent, and to license the property back to Jackson at the same rental, in order that he might carry on their business on the premises under the commission agency agreement of April 28, 1925.

Jackson objected to clauses numbered 2 and 5 in the license agreement, and clause 7 in the employment agency agreement, and deferred signing the lease and license agreements for sometime.

But finally the lease and the license contracts were executed on September 21, 1925, without striking out said clauses, and were sent to the headquarters at Atlanta where they were also executed by the company's agent. But Jackson testified that Mr. Woodward, superintendent of The Texas Company, stated to him if he would sign the lease and license agreements that the company would not undertake to enforce clause 7 of the employment contract; but he explained that that did not mean that the company would keep him employed if he did anything illegal or anything wilfully wrong, and with this understanding signed the papers. He stated that he signed the contracts believing that the language of the written contract meant that he could be discharged for cause only.

Clause 2 of the license agreement is as follows:

"(2) Term. This license shall continue for the term of 5 years from the first day of September, 1925, but subject to termination by licensor 30 days before the expiration of 12 months or at any time thereafter by 30 days' prior written notice from the licensor to the licensee."

The clause 5 of said license agreement is as follows:

"(5) Cancellation. Licensor hereby reserves the right at any time to cancel and terminate this license forthwith in the event of the termination or failure of consummation of a certain Employment Agency Agreement Contract now in force or being negotiated between the parties hereto, or any agreement in continuation thereof, or in substitution therefor, or in case the licensee ceases to store, handle or sell the products of the licensor; or in case the licensee does not conduct the business on the licensed premises with due diligence and in the judgment of the licensor; or in the event

of the expiration or termination of a certain lease, ''or sublease or agreement dated first day of September, 1925, by and between Chas. P. Jackson and licensor.''

By the terms of the lease contract of September 1, 1925 the plaintiff Jackson leased his warehouse and storage plant to The Texas Company for the term of five years at $400 per month.

By the terms of the license agreement the company licensed said plant back to Jackson for the same rental per month, subject to the conditions set out in the clauses hereinabove quoted. The employment contract of May 1, 1925 was for no definite period of time, and it contained the clause number 7 hereinabove quoted which provides ''the company, at will and with or without cause, has a right to terminate employment.''

Jackson further testified that the company by its agent Woodward had verbally agreed to cancel clause 7 of this agreement, or rather not to enforce clause 7. He stated that Mr. Woodward told him at the time he signed the lease and license agreement that he (Woodward) did not have authority to change the written contract, and that if any changes were made in the contracts prepared by The Texas Company that the company would just ''shoot it back and refuse to enter into it'' but so long as a man was behaving and carrying on his business properly The Texas Company had never been known to turn him off and that he could verbally waive the clause, and that Woodward agreed to employ him for five years during the life of the lease contract and that he would not be discharged except for cause. He further stated that no change was made in the license agreement.

Jackson's plant was audited twice under the last employment agency contract. It was audited on June 28, 1925 and Jackson had a shortage of 11,000 gallons of gasoline. Jackson satisfied the company that some of the gasoline tanks were short on arrival in Nashville and that there was a loss from evaporation. The company accordingly allowed him his proven tank car shortages, one per cent of the total amount of gasoline handled, leaving only about 300 gallons unexplained for which they required him to pay.

It is shown that gasoline expands and contracts with the weather conditions, increasing or losing in bulk, and some is lost by evaporation and other causes when handled. It was the policy of the company to allow a credit on an agent's account for bona fide tank car shortage and it was estimated that the shortage due to natural causes, evaporation, etc., would not usually exceed one per cent of the total volume of gasoline handled.

It appears that the volume of business conducted by Jackson for The Texas Company was considerable, and that the Company's al-

lowance for shortage for natural causes seemed to be satisfactory until the plant was audited on January 25, 1926.

On January 25, 1926 Jackson's Plant was audited by the company's auditor, Garland, covering a period of seven months, and in this audit it developed that Jackson was short 22,289 gallons of gasoline, besides large quantities of oil that were unaccounted for. After Garland had completed the audit he informed Jackson of the shortage and after some discussion, the details of which is disputed, Jackson told Garland and another agent, Tatom, that he had used about 6000 gallons of gasoline and had paid some of his private debts with some of the company's oil. Thereupon Garland dictated a letter for Jackson to the District Manager at Atlanta, stating the amount of shortage, and his appropriation of part of the products of the company, which letter is as follows:

"Mr. J. S. Jones, Dist. Manager,                    Nashville, Tenn.,
"The Texas Company,                                 January 28, 1926.
"Atlanta, Georgia.
"Dear Sir:—

"On January 25, 1926, D. H. Garland, Station Auditor for the Texas Company, made an audit of Nashville, Tennessee station. As a result of same, he has informed me of shortages on various products which I am listing below:—

| | | |
|---|---|---|
| Crystalite | 331 | gallons |
| Gasoline | 22,289 | '' |
| Aleph Oil | 169 | '' |
| Canopus | 34 | '' |
| Copella | 9 | '' |
| Motor Oil E. H. | 56¾ | '' |
| Altair | 145 | '' |
| Winner Motor Oil Co. | 270 | '' |
| Winner Motor Oil D | 92 | '' |
| Lyra Cylinder Oil | 22 | '' |
| Motor Oil, Heavy | 32½ | '' |
| Motor Oil, Medium | 117 | '' |
| Motor Oil F F | 45 | '' |
| Liquid Wax Dressing 4/12-12/qt.1 | | '' |
| Winner Motor Oil E | 330 | '' |
| Home Lubricant 12/72-72/4 3/8 | | '' |
| Corvus Oil | 11 | '' |
| Graphite Axle Grease 1-48/1 | 48 | pounds. |

"Of the gasoline shortage I have converted to my personal use approximately six thousand gallons (6000) during the period covered from audit made June 22, 1925, and audit made January

25, 1926, which I have not covered by sales tickets as transactions should have been covered or reimbursed the company for same. I have also delivered 160 gallons of Winner Motor Oil E and 65 gallons Altair Oil to Miles Motor Company, 100 gallons Aleph Oil to Cumberland Motor Company, 30 gallons Motor Oil, Medium, to Edward E. Schiel, all of Nashville, Tennessee, having same applied on my personal accounts with these firms, and same has never been covered by sales tickets or reimbursement made to company to cover.

"I have used in the operation of my trucks 95 gallons Winner Motor Oil E, 35 gallons Aleph Oil, 12 gallons Motor Oil, Medium, 2 gallons Motor Oil, Extra Heavy, and 40 gallons Altair Oil, and have never covered same by sales tickets or made reimbursement to the company to cover.

"The 12/72-72/4-3/8 gallons of Home Lubricant and 1-48/1-48# Graphite Axle Grease were delivered to customers and no sales tickets made, but same can be rendered and these products will be covered.

"I am unable to pay for these shortages at the present time as I haven't sufficient funds, but am willing to pay for same if given terms which I can meet.

"Mr. W. M. Tatom is leaving for Atlanta tonight and will see you personally and explain my position more fully, and I trust that you will be lenient on me and arrange satisfactory terms for settlement.

"Witnesses                          Yours very truly,
"D. H. Garland                      Chas. P. Jackson,
"W. M. Tatom.                       Agent, The Texas Company."

Jackson had not sent in a single charge ticket showing the amount of gasoline or oil converted to his own use, or any of the oil converted in paying his own individual debts, during these seven months, but Jackson, his father and his brother testified that whenever Jackson would take any of the company's oil or gasoline, he or his employee would write the number of gallons on a pasteboard card which they kept nailed up in a conspicuous place in the warehouse, and he insists that he was not instructed to report daily the amount of gasoline used by him, and that he had told Woodward, at the time the lease and license contracts were executed that he owed bills to certain garages that he had been paying in oils and asked Woodward what he should do about them, and he says that Woodward replied, "You will have to work that out and do the best you can;" hence he had continued to pay these garages in oil and had kept the amounts during the seven months but had not

reported charge tickets to The Texas Company. The district manager Jones at Atlanta upon being informed of Jackson's letter admitting the conversion of 6000 gallons of gasoline and large quantities of oil covering a period of seven months, without reporting daily by charge tickets, instructed Woodward to relieve Jackson at once and to put another man in his place. Woodward accordingly discharged Jackson and placed W. M. Tatom in this position on January 28, 1926.

In the final settlement Jackson was required to pay for a shortage of only 14,844 gallons of gasoline out of the total shortage of 22,889 gallons and he was credited with tank car shortage amounting to 7,445 gallons.

The determinative questions are, was there any material evidence tending to show (1) that the plaintiff wrongfully breached the employment and license agreements, or (2) that the defendant acted in bad faith and induced the plaintiff by fraud and deceit to enter into the lease and license contracts for the purpose of obtaining possession of plaintiff's property.

After a careful examination of the record and the authorities we think that all the assignments of error should be overruled, and the judgment dismissing the action should be affirmed.

(1) Under the commission agency contract of April 28, 1925, clause No. 7, he could be discharged for or without cause, as this employment contract provided employment for no definite period of time and could be terminated at will by either party to the agreement.

Ordinarily oral testimony is not admissible to contradict a written contract. See Somerville v. Gullett Gin Company, 137 Tenn., 509, 194 S. W., 576. But it is insisted that the parol agreement eliminating clause No. 7 was made subsequent to that agreement and therefore this rule does not apply. But by an examination of the license contract it will be seen that it refers to this commission agency contract and that contract is made a part of the license contract. Hence it is the same as if that whole commission agency contract was incorporated into the body of the license contract; and any parol agreement eliminating clause No. 7 made before or at the time the license agreement was executed falls within the rule that parol evidence is not admissible to contradict or vary the terms of a written contract. See Litterer v. Wright, 151 Tenn., 210, 268 S. W., 624.

However it is admitted by Jackson that the agent stated that he had no authority to change the written contract and that the company would fire it back and not execute it should a change be made, as hereinabove stated. This put Jackson upon notice of the agent's want of authority. We thoroughly reviewed this proposition and

the authorities in the case of The White Company v. Bert Bacherig, Davidson County Law, 9 Tenn. App., 505. We think that when this agent told Jackson that he had no authority to change the written contract that this was sufficient to put Jackson upon inquiry and to make it his duty as an honest and prudent man to inquire concerning the authority of an agent who made such a statement. Whatever is sufficient to put a party on inquiry is equivalent to actual notice. See War Finance Corporation v. Ready, 2 Tenn. Apps. Reps. 67; 21 Am. & Eng. Ency. of Law (2 Ed.), 584 and 590. This is true whether he be the chief executive officer of the corporation or a mere traveling salesman. See .Continental Insurance Co. v. Schulman, 140 Tenn., 492-493, 205 S. W., 315. It is proven, and not contradicted, that the agent Woodward had no authority to change the written contract or to eliminate clause No. 7.

(2) The Texas Company had sufficient cause to discharge Jackson, as he admitted in his letter and in his testimony that he appropriated 6000 gallons of gasoline and also quantities of oil. He agreed in clause No. 5 "not to use the company's goods or funds in any way for private purposes." We think there is no difference between wrongfully converting gasoline and wrongfully appropriating the company's money without making reports. The fact that Jackson was under bond or was not instructed about this proposition, as insisted by him, is no excuse. He did not need any instructions not to convert other peoples' property to his own use. We fully reviewed the authorities on this proposition in an opinion written by the writer of this opinion in the case of J. E. Annis v. N. S. Nicholson, et al., Hamilton County Equity, filed in Nashville at the September term, 1924.

"Even where the agency is for a definite term, the principal has a right to revoke it before the expiration of such term, without incurring liability for damages, because of the agent's failure faithfully to perform his express or implied undertakings as agent, so where the agent violates his instructions, or without his principal's consent engages in an employment or business for himself or another which tends to injure his principal's interests, even though he so conducts such other business that it does not interfere with the time and attention due his principal's business." See 2 C. J., 536, section 160 (4).

Under the authorities above stated, parol evidence of an oral agreement waiving the clause No. 5, and agreeing that Jackson might pay his personal debts with oil is not admissible.

(3) We think there is nothing in the proposition that The Texas Company was estopped by its course of conduct to discharge the plaintiff for the reasons assigned, because all the agents of The

Texas Company testified, and it is not contradicted, that they knew nothing of Jackson's shortage until the last audit was made by Garland on January 25, 1926.

However it is essential that the party claiming the benefit of estoppel should have proceeded in good faith. Conduct or representations induced by his own conduct or representations, especially when fraudulent, cannot furnish the basis of a claim for an estoppel. See 21 C. J., 1138; State v. O'Brien, 94 Tenn., 79, 28 S. W., 311.

> "An employer has a right to discharge an employee at any time for just cause. The fact that he bears with the incompetency or irregularities of such employee for a time, or for years, even, does not estop him from discharging such employees for such incompetency if it continues." Glasgow v. Hood, 57 S. W., 162.

(4) We are of the opinion that The Texas Company and its agents were not guilty of any fraud or deceit and there is no proof of such fraud or deceit. Woodward had no authority to change the contract of which Jackson had notice. There can be no fraud in this.

(5) We think that the assignment that "the court erred because it took from the jury the issue of fact of plaintiff's right to recover from defendant the price of gasoline evaporation or natural shortage which the defendant withheld from the plaintiff," is not well made, because the plaintiff did not sue for this in his declaration and practically abandoned this contention in his brief. He has not sued for money had and received, and we think there is nothing in this proposition.

Where the case involves only questions of law; where but one reasonable conclusion can be drawn from the proof adduced; where there is no disputed evidence on the material points; where, although the evidence is conflicting on minor matters, a conceded fact shows that the evidence on one side cannot be true; or, where by giving to the opposite party the benefit of the most favorable view of the evidence the verdict against him is demanded, a verdict should be directed. 38 Cyc., 1565-1567; Railroad v. Justice, 5 Hig., 69.

We think the court erred in admitting parol evidence that the agent agreed to waive clause 7 of the commission agency contract and to eliminate clauses 2 and 5 of the license agreement for the reasons hereinabove stated.

> "A ruling sustaining a demurrer to the evidence will not be reversed notwithstanding that sufficient evidence was actually admitted by the trial court to make a prima-facie case for plaintiff, where a part of the evidence essential for that purpose was incompetent and admitted over proper objection, although it was not formally stricken out, and no notice was

given plaintiff that it was to be disregarded." Lee v. Missouri Pacific Railroad Company, Kans., 63 L. R. A., 271.

We are of the opinion that where incompetent testimony is received over objection, it is within the province of the trial court to correct such error at any time before final disposition of the case, and where he admits incompetent testimony, and if a verdict was rightly directed on any ground we should sustain it. See Eisentrager v. Great Northern Railway Co., Iowa, 160 N. W., 311, L. R. A., 1917B, 1245; opinion of Judge Faw in case of J. C. McInnis v. W. G. Pritchard, Shelby County Law, filed at Jackson at the January term, 1922 by the Court of Civil Appeals.

It results that all the assignments of error must be overruled, and the judgment of the lower court dismissing the action must be affirmed. The cost of the cause is adjudged against plaintiff in error Jackson and the surety on his prosecution bond, but the cost of the appeal is adjudged against Jackson. Executions will issue accordingly.

Faw, P. J., and DeWitt, J., concur.