**Dorothy CURTIS, Plaintiff/Appellee,**

v.

**Harold REEVES, Fred Rosenberg, d/b/a RAHFG, Joint Venture, Defendants/Appellants.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

April 15, 1987.

Rehearing Denied by Supreme Court Aug. 3, 1987.

Thomas C. Binkley, Mary G. Moody, Trabue, Sturdivant & DeWitt, Nashville, for plaintiff/appellee.

John J. Hollins, J. Russell Heldman, Hollins, Wagster & Yarbrough, P.C., Nashville, for defendants/appellants.

## OPINION

LLOYD TATUM, Special Judge.

At a bench trial, the Chancellor awarded judgment in the sum of $29,000.00 in favor of the plaintiff, Dorothy Curtis, for breach of a contract under the terms of which the plaintiff was to receive compensation for performing "custodial services". The Chancellor held that since the plaintiff was an independent contractor, she could not be discharged for cause during the term of the contractual relationship. We disagree and reverse the judgment of the trial court.

We concur with the finding of fact clearly set forth in a memorandum filed by the Chancellor:

"This case was tried before the Court with the undersigned judge, sitting by interchange, on May 7, 1986, and then taken under advisement.

In this action, Dorothy Curtis, plaintiff, seeks to recover a judgment against Harold Reeves and Fred Rosenberg, defendants, in the amount of thirty-four thousand, two hundred and fifty dollars ($34,250.00), for an alleged breach of a maintenance contract related to custodial services at 640 Spence Lane, Nashville, Tennessee. At the outset, it should be noted that the plaintiff is the former mother-in-law of the defendant, Harold Reeves (hereinafter defendant). The defendant is a licensed attorney practicing real estate law in Davidson County.

On December 22, 1983, plaintiff, Dorothy Curtis, and defendants, Harold Reeves and Fred Rosenberg, D/B/A RAHFG, Joint Venture, entered into an agreement regarding custodial services for a building owned by the Joint Venture—Before entering into this written agreement, the plaintiff had been performing custodial services for the defendants for three (3) years under an oral agreement and was compensated for such services in an amount of nine hundred dollars ($900.00) per month which was later raised to nine hundred and fifty dollars ($950.00) per month. At no time, either in the three years prior to the signing of the written contract or thereafter, did the defendant withhold taxes or social security payments from the compensation paid to the plaintiff. The written contract indicates that the plaintiff is not an employee of the owner. The plaintiff at times hired another worker whom she paid out of her compensation to help her perform the custodial duties. The written agreement was entered into due to the expectation of the parties that the defendants were about to sell the building, and that the prospective buyer had indicated that he would honor any agreement regarding custodial services entered into due to the expectation of the parties that the defendants were about to sell the building, and that the prospective buyer had indicated that he would honor any agreement regarding custodial services entered into by the sellers, Reeves and Rosenberg.

The agreement, signed on December 22, 1983, titled 'Maintenance Contract' provided as follows:

This contract effective January 2, 1984, by and between RAHFG, Joint Venture (owner) and Dorothy Curtis (custodian). Whereas the parties have had a mutually beneficial working agreement for three years, and each has enjoyed the relationship, and wish to continue and to reduce their agreements to writing.

Whereas owner agrees to pay $950.00 per month thru 1984, and, thereafter, $1,150.00 per month thru 1985, and $1,150.00 per month thru 1986.

Owner acknowledges its responsibility to pay for supplies used in cleaning the building and delegates to custodian the right to purchase same, and owner will reimburse same upon presentment of the actual receipts for same.

Owner and custodian do hereby acknowledge that owner does not provide insurance of any kind, because custodian is not an employee.

This agreement was drafted by the defendant, Harold Reeves, and according to the testimony of both parties, the plaintiff was asked to read it, think about it overnight, and then return it to the defendant. The plaintiff took the agreement home, thought about it, signed it, and returned it to the defendant. The agreement was then signed by the defendant on behalf of the Joint Venture.

According to the terms of the written agreement, it became effective on January 2, 1984. However, subsequent to that date, the prospective purchaser of the building decided not to purchase the building. The defendants, however, began paying the plaintiff in January of 1984, the amount due and owing under the contract. Even after the sale of the building fell through, the defendant con-

tinued to pay the plaintiff consistent with the terms of the contract.

As previously mentioned, the plaintiff was the defendant's mother-in-law. At the time the contract was signed, her daughter had been married to the defendant some ten (10) years. During the Spring of 1984, however, the defendant and his wife separated and their marital problems cast a shadow over the business relationship between the plaintiff and the defendant. At no time did the defendant have any complaint about the quality of the plaintiff's work as custodian in his building. In May of 1984, the marital problems between the defendant and his wife caused an end to the business relationship between the plaintiff and the defendant, acting on behalf of the Joint Venture.

On Mothers day in May, 1984, members of the plaintiff's family and members of the defendant's family had an accidental meeting at Ruby Tuesday's, a restaurant in Nashville. At this time, the plaintiff's daughter and the defendant were separated. The accidental meeting resulted in a verbal altercation between members of the plaintiff's family and the defendant. The defendant contends that the plaintiff, who was present, contributed to this verbal altercation.

Thereafter, plaintiff, while at work as a custodian, came into the office of Ms. Clara Harper, a tenant of the building owned by the defendants on Spence Lane, and told Ms. Harper of the marital difficulties between her daughter and the defendant. Ms. Harper testified that the plaintiff told her of the Ruby Tuesday's incident, as well as other stories about the defendant and her daughter's marital problems. Finally, the plaintiff stated that she could not understand how Ms. Harper could stay in a building where her landlord was of such low moral character.

Subsequent to that conversation, the defendant sought out Ms. Harper and inquired of her whether his mother-in-law, the plaintiff, had been speaking ill of him. She told the defendant that the plaintiff had discussed his marital problems and also informed him that the plaintiff had mentioned the Ruby Tuesday's incident, as well as the plaintiff's low opinion of the defendant. Specifically, she mentioned the plaintiff's statement regarding how Ms. Harper could stay in the building when her landlord, the defendant, was of such low moral character.

After the conversation with Ms. Harper, the defendant spoke to the plaintiff and advised her that her employment had to be terminated because he no longer felt comfortable around her. The defendant reminded her that he had previously advised her that if she became involved in his divorce proceedings that he would have to terminate her services. After his conversation with Ms. Harper, he told the plaintiff that the termination of her employment was necessary because she was 'poisoning the tenants' by discussing his marital problems and making derogatory remarks about him. He did request that she continue her custodial services until the end of the month. The defendant readily admits that the plaintiff's custodial services were always adequate and that he had no complaints as to the quality of her work. Her 'termination' was a result of her comments to Ms. Harper and to a lesser extent, her involvement at the earlier Ruby Tuesday's incident."

In his conclusion of law, the Chancellor held that since the plaintiff was an independent contractor "her misconduct regarding comments about the defendant's character relating to the divorce and having nothing to do with her obligations" would not authorize her discharge for misconduct. The Chancellor cited no authority in support of this conclusion; the plaintiff has cited none and we have located none by independent research.

In *Nelson Trabue, Inc. v. Professional Management Company, etc.*, 589 S.W.2d 661 (Tenn.1979), the Supreme Court held that an employer could discharge for cause a person employed by a contract for a term of one year. The Court observed:

"The general rules with regard to contracts of employment are well settled. They are stated in the case of *Little v. Federal Container Corp.*, 61 Tenn.App. 26, 452 S.W.2d 875 (1969) as follows:

'Generally, a contract of employment for an indefinite term is a contract at will and may be terminated by either party. [citations omitted]. Whereas, a contract for a definite term may not be terminated before the end of the term, *except for cause* or by mutual agreement, unless the right to do so is reserved in the contract. 56 C.J.S. Master and Servant § 30, p. 411.

'An employer has the right to discharge an employee at any time for just cause. The fact the employer bears with the incompetency or irregularities of such employee for a time does not estop the employer from discharging the employee for such incompetency if it continues.' 61 Tenn.App. at 31–32, 452 S.W.2d at 877–78.

In the earlier case of *Jackson v. The Texas Company*, 10 Tenn.App. 235, 244, (1929), it was held that even where an agency is for a definite term, the principal has a right to revoke it before the expiration of the term without incurring liability for damages because of the failure of the agent faithfully to perform his express or implied undertakings. *See also Moyers v. Graham*, 83 Tenn. 57 (1885). In the latter case an attorney had been employed to represent a client in a claim before the United States Treasury. The attorney was later disbarred, and the client obtained other counsel. Thereafter the attorney was reinstated and sought compensation from his client who had been successful in the prosecution of his claim. No basis for a quantum meruit recovery was found, and the client was otherwise held to have had just cause to discharge the attorney.

As stated in 53 Am.Jur.2d, *Master and Servant* § 49 (1970):

'While an employer may discharge at will one employed for no definite term without incurring liability, the employer, in order to justify dismissal of one employed for a specific period, must be able to show a breach on the part of the employee of some express or implied provision of the contract of service. The implied provisions of such a contract are violated when the servant does something inconsistent with the relation of master and servant or incompatible with the due and faithful performance of his duties.'"

In the *Nelson Trabue* case, the Supreme Court made no distinction between an "employee" (as that term is used synonymously with the term "servant") and an "independent contractor." None of the cases discussed in the *Nelson Trabue* opinion make any such distinction. In *Jackson v. The Texas Company*, 10 Tenn.App. 235 (1929), cited with approval in the *Nelson Trabue* opinion, there existed a principal-agent relationship. In *Moyers v. Graham*, 83 Tenn. 57 (1885), also cited in the *Nelson Trabue* case, there existed an attorney-client relationship.

In *Kippen v. American Automatic Typewriter Company*, 324 F.2d 742 (9th Cir.1963), the Court was considering whether or not the defendant had just cause for terminating a franchise contract because of plaintiff's use of intoxicating liquor. The plaintiff argued that the defendant could not terminate the contract for just cause because he was an independent contractor. In rejecting this argument, the Court said:

"The first issue presented is whether American had good cause for terminating the contract with Kippen. Since Kippen's appointment contained no express condition pertaining to the use of intoxicating liquor, the issue just stated necessarily calls for a determination of whether there was an implied condition of this kind, and, if so, its nature.

Apparently believing that no such implied condition exists in the case of independent contractors, or if it does exist it is of a narrow scope, Kippen argues that this was his status as distributor for American. The decisions which have come to our attention, however, treat comparable distributorship contracts, at least in part, as agency contracts. *Moreover, we think that in view of the duties*

*Kippen was expected to perform the existence and scope of any such implied conditions would be substantially the same whether his relationship to American is characterized as that of independent contractor, agent, or employee."* (Emphasis supplied)

Whether or not a person is a servant (employee), agent, or independent contractor is relevant in regard to certain legal rights and obligations but not in others. "The term 'independent contractor' is used in contrast with 'servant' in determinating a 'master's' vicarious tort liability, and sometimes with 'employee' in ascertaining liability of an 'employer' under various types of social legislation." *Derrick v. The Drolson Company*, 244 Minn. 144, 69 N.W.2d 124, 127–128 (1955). The distinction is of no logical significance when considering the employer's right to terminate an employment contract for just cause.

As stated by the Chancellor, the primary reason for the plaintiff's discharge was her conduct relating to the tenant, Mrs. Clara Harper, the marital difficulties between her daughter and the defendant, Harold Reeves, and the derogatory remarks made to Mrs. Harper about Mr. Reeves, finally telling her that she (plaintiff) "could not understand how Mrs. Harper could stay in a building where her landlord was of such low moral character."

In *Wyatt v. Brown*, 42 S.W. 478, 481 (Tenn.Chan.App.1897), the Court stated:

"It needs no argument to justify a decision that inattention to duty is sufficient cause to discharge an employee.... It was his duty to look to the best interest of the business committed to his care. *It was incumbent upon him to do all he reasonably could to advance the interest of that business, and to develop it.*" (Emphasis supplied)

We agree with the following from 56 C.J.S., *Master and Servant*, § 42(a):

"As a general proposition, any act of the servant which injures or has a tendency to injure his master's business, interests, or reputation will justify the dismissal of the servant. Actual loss is not essential; it is sufficient if, from the circumstances, it appears that the master has been, or is likely to be, damaged by the acts of which complaint is made. The fact that the contract of employment authorizes the employer to terminate it for certain specified causes does not necessarily prevent the employer from discharging the employee for a legal cause not so specified."

We have no hesitancy in holding that the statements made by the plaintiff to the defendant's tenant, encouraging her to leave the premises, was detrimental to the defendant's business interest, his reputation, and violated the plaintiff's duty to advance the interest of the business.

Since the issue discussed is dispositive of this case, we pretermit the other issues.

The judgment of the trial court is reversed and the plaintiff's suit is dismissed. Costs in this court and in the trial court are adjudged against plaintiff/appellee.

TODD and LEWIS, JJ., concur.