IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE

# HARRY W. BORDERS, d/b/a RISK MANAGEMENT ASSOCIATES v. RONNIE J. B. CROW, d/b/a RONNIE CROW INSURANCE SERVICE

**A Direct Appeal from the Circuit Court for Davidson County**
**No. 96C-3472     The Honorable Hamilton V. Gayden, Jr., Judge**

----

**No. M1999-00985-COA-R3-CV - Decided July 13, 2000**

----

This is a suit by employee for compensation allegedly due after discharge under oral contract of employment. Upon finding that the discharge was for cause, the jury nevertheless returned a verdict for the employee for post-discharge compensation. On the employer's appeal, we vacate that part of the judgment awarding post-discharge compensation.


**Tenn.R.App.P. 3, Appeal as of Right; Judgment of the Circuit Court is Vacated and Remanded.**

CRAWFORD, P.J., W.S., delivered the opinion of the court, in which FARMER, J., and LILLARD, J., joined.

Dennis L. Tomlin, Hendersonville, For Appellant

Lee D. Anderson, Nashville, For Appellee

## OPINION

The complaint of plaintiff, Harry W. Borders (Borders), filed September 23, 1996, alleges that in September of 1994, both plaintiff and defendant, Ronnie J. B. Crow (Crow), are insurance brokers associated with Liberty Insurance Agency, Inc., that Borders specialized in group health, cancer, disability, and hospital insurance, and Crow handled primarily commercial property and casualty insurance. The complaint avers that on or about September 24, 1994, Crow requested Borders to assist Crow in handling the group health and other insurance programs for members of the Teamsters Local 327. Borders avers that Crow orally agreed to pay fifty percent of all the net commissions and fees earned by the defendant from the life, health, disability and related insurance business that Crow obtained from the Middle Tennessee Teamsters trust fund account. The complaint further avers that in reliance upon the oral agreement, plaintiff spent many days working on the insurance needs, such as retaining a re-insurance company, a third party insurance

administrator, obtaining various insurance rates from companies, structuring the insurance plans and assisting Crow in convincing the administrator of the Teamsters trust and the employer companies to allow Crow to write and administer the insurance program.

The complaint further avers that in about January, 1995, the Teamsters 327 and Middle Tennessee Teamsters Trust agreed for Crow to provide the group insurance. Later on, two employer companies, who had collective bargaining agreements with the union, agreed to allow Crow to provide for employees' insurance needs, specifically short and long term disability and cancer insurance. Borders alleges that a short time after Crow started handling the trust fund insurance business, he "maliciously and fraudulently" notified Borders that Borders would only receive a one-third percent of the net commissions and fees earned instead of the fifty percent that they had previously agreed upon, and that Crow "maliciously and fraudulently told Borders that he could take one-third or leave it, or words to that effect." The complaint further avers that the first policy period was from March 1, 1995 through February 29, 1996. Borders avers that on or about October 9, 1995, Crow "maliciously and fraudulently" advised Borders that he was cancelling their contract effective September 30, 1995, and that Borders would be paid through that date on the one-third basis previously stated to him. The complaint then related various commissions and fees obtained by Crow in amounts that should have been paid to Borders under the fifty percent basis, and on the one-third basis. The complaint seeks commissions earned prior to termination, and the complaint as amended seeks commissions and fees as follows:

> The plaintiff avers upon information and belief that defendant Crow because of the plaintiff's work will receive fees and commissions from various insurance policies from March 1, 1995 to May 1, 2000 amounting to approximately $276,674.75 and that the plaintiff is entitled to fifty (50%) of that amount totaling $149,301.85 plus interest and reasonable attorney fees. These figures are assuming the group life and health partially self-funding policy remain constant throughout the total period of the defendant's contract. If so, the balance due the plaintiff is $149,301.85 plus interest and reasonable attorney fees. Had the defendant continued to pay the plaintiff on a one-third (33.3%) basis the plaintiff would have a balance due him amounting to $110,440.67 plus interest and reasonable attorney fees.

> \*          \*          \*

> It is anticipated that defendant Crow will keep the said insurance coverage from March1, 1995 to May 1, 2000.

The complaint also seeks punitive damages and attorney fees.

The defendant's answer denies the material allegations of the complaint and joins issue thereon. Defendant further avers that plaintiff was terminated from his employment for cause as of

August 1, 1995.

On May 5, 1999, the trial court entered an order granting partial summary judgment to defendant "as to the causes of action for fraud, willful misrepresentation and deceit, and any other cause of action relating to fraudulent conduct." The order further provided: "that this action shall proceed as a contract claim with no claim for punitive damages or attorney's fees."

Although the testimony in the record is sketchy as to details and terms of a contract, the parties concede that an oral employment contract was made between the parties whereby Borders would assist Crow in formulating and servicing the group health insurance program for members of Teamsters Local 327 (herein referred to as "Teamsters" or "Teamsters Trust"). The Teamsters participate in an ERISA health insurance trust known as Middle Tennessee Teamster's Trust Fund. At the time of the contract, both parties were in the insurance business, and both had an office at Liberty Insurance Agency in Nashville.

The Teamsters' group health insurance account was acquired by Crow and became effective on March 1, 1995 and apparently expired April 30, 1996.[1] Borders found a third party administrator for the program. Sometime between September 29, 1995 and October 3 or 4, 1995, Borders learned that he was being terminated by Crow. Borders has not received any monies from Crow since that time. In September of 1996, Borders brought an action against Crow.

A jury trial was held May 10 -12, 1999. Ronald Hebert, owner of Liberty Insurance Agency, testified on behalf of Borders. Hebert testified that Borders is an expert in life and health insurance and that Crow primarily wrote property casualty insurance. Hebert knew that Borders was working on the Teamsters' account for Crow. Hebert believed that Crow had a general knowledge of health insurance, but did not have expertise equal to that of Borders.

Borders testified that Crow approached him while they were both in business with Liberty Insurance Agency and asked him to have lunch. Borders agreed, and during the lunch meeting, Crow stated that he had an opportunity to write the partially self-funded group insurance program for the Teamsters Trust. Borders testified that Crow asked him to look at the opportunity and tell him what could be done. According to Borders, he advised Crow that there was quite a bit of research to be done and told him what documentation he would need from the Teamsters. Crow provided all the documentation from his client, the Teamsters, and Borders determined that the account would be profitable. Borders prepared a quote and interviewed two third party administrators, one of which was Adminitron. Adminitron acquired a reinsurance carrier to provide a quote on the partial self-funded group insurance. Borders stated that he prepared a proposal for presentation to the Teamsters in December of 1994, which demonstrated what their current program

_____

[1] The parties agree that the formulation of the insurance arrangements took place in early 1995. Crow testified that he had a written contract with the Trust Fund but had lost it. However, he did introduce as evidence a contract between the Trust Fund and Crow dated May 1, 1996 and to terminate May 1, 2000.

did and provided information on two proposed plans that they could select for the Trust. Borders conceded at trial that the Teamsters Trust account was procured by Crow and was Crow's account.

Borders testified that the Teamsters Trust plan selected had a specific stop loss premium of $21.08 per insured union member, per month, and an aggregate stop loss premium of 92 cents per insured union member, per month. The average life premium was $4.01 per insured union member, per month. The agent's commissions and fees totaled approximately $5.00 per insured union member, per month. The administrative cost of the plan was $21.13 per month, representing the amount paid to the third party administrator for administering the program and managing the claims. The proposal was entered as Exhibit No. 1.

In setting up the group health insurance account, Border stated that he and Crow put on several meetings to present applications to the member companies. The applications were filled out by the individuals, and Borders and/or Crow were present to answer questions. From the applications they would prepare a report to be sent to the employer to enable them to setup payroll deductions to pay the employees' premiums. Borders testified that he also developed a cancer program and disability program for the Teamsters Trust.

Borders presented copies of checks that he received from Crow and testified that they represented one-third of the commissions and fees earned from the Teamsters' account through July 31, 1995. Borders received five checks totaling $6,539.17, copies of which were admitted at trial as exhibits: April 2, 1995 in amount of $542.35; June 17, 1995 in the amount of $1,116.41; July 7, 1995 in the amount of 1,339.54; August 22, 1995, in the amount of 1,825.57; and September 14, 1995, in the amount of $1,767.43. Borders explained that there was a two month lag between the time that the commissions were earned and when he received his portion. Borders received the last check from Crow on September 14, 1995 in the amount of $1,767.43, representing his share of the premiums generated during July 1995. He was never paid for his work in the months of August and September 1995.

Borders testified that Crow originally agreed to compensate him with one-half of the commissions and fees earned from this business. Later, Crow unilaterally changed the agreement so that Borders would receive only a one-third share.[2] Borders claimed to have obtained all of the insurance companies to write the necessary insurance polices and to have located an administrator for the group life and health program. Borders claimed that when Crow began paying him on a one-third basis, instead of the one-half basis verbally agreed to, he told Borders to "take it or leave it." Borders presented as Exhibit No. 5 copies of compensation statements paid to Crow by Adminitron, the third party administrator, revealing that there were two checks every month from Adminitron to Crow, one for commissions and one for fees.

---

[2] The trial court instructed the jury that the agreement was one-third and not one-half of the commissions and fees. This is quite unusual in light of the disputed testimony on this point. However, Borders has not presented any issue concerning this instruction.

Borders also presented a 1995 IRS 1099 miscellaneous form from Adminitron, Inc., to Ronnie Crow Insurance in the amount of $15,552.46, and a 1996 IRS 1099 miscellaneous form from Adminitron to Crow in the amount of $10,872.98, representing reinsurance commissions earned in those years. Borders presented a 1995 IRS 1099 miscellaneous form from the Middle Tennessee Teamsters Trust Fund to Ronnie Crow in the amount of $18,540.29, and a 1996 IRS 1099 miscellaneous form in the amount of 31,863.78 or 21,863.78 (the first digit is not legible), representing administrative fees and agent fees for the group insurance program and life insurance program earned during those years. Borders presented a 1995 IRS 1099 miscellaneous form from National Travelers Life Company to Ronnie J. Crow in the amount of $7,594.72, and a 1996 IRS 1099 miscellaneous form in the amount of $14,532.49, representing commissions earned and paid for the cancer coverage provided to members who were covered.

Using Crow's IRS 1099 forms, Borders produced Exhibit 18, a computation of damages representing one-half and one-third of the commissions and fees earned on the Teamsters' account. Borders' calculations indicate that in September of 1995, Crow received commissions of $1,920.85 and fees of $3,109.60 totaling $5,030.45. Border states that he used the figure from September of 1995 in his damage calculations, because that was the last month that he was involved in this business. Borders calculated his damages by taking the $5,030.45 figure, representing total fees and commissions for group life and health insurance and for disability and cancer insurance, and multiplying by 55, the number of months left under the contract with the Teamsters that ran to May 1, 2000. Borders calculated the gross projected total commissions and fees paid to Crow based on the participation as of September 1995 at $276,674.75. Borders represented that the actual records indicate that Crow received $29,502.93 from March 1, 1995 to October 1, 1995. The total actual and projected group life and health plan commissions and fees for the whole contract was therefore $306,177.68. Borders testified that based on the 1099 forms from National Travelers Life Insurance Co., the cancer insurance carrier, and Phoenix Home Life Insurance, the disability insurance carrier, Crow received $31,900.00 over a two-year period. However, Borders was unsure if this coverage was still offered, so included no projected commission amount from National Travelers Life or Phoenix Home Life in his calculations. Borders testifies that according to his figures, Crow's total commissions and fees from all sources, the group life and health, the administrative fees, the cancer coverage, and the disability coverage, would total $338,072.39 over the whole period of the contract with the Teamsters Trust. Since Borders had been paid $6,539.17, he claimed that his total commission, figured at one half should be $162,000.00, and figured at one-third should be $106,151.00. Borders pointed out that his calculations included no commissions due him for people that were added to the plan after his termination.

Crow disputed the fact that he agreed to pay Borders one-half of the commissions and fees and testified that the agreement was to pay Borders one-third of the commissions and fees. Crow acknowledged that with some help from Borders he gathered the necessary information needed to generate a proposal, which was presented to the Teamsters Trust. Crow points out that the Teamsters Trust was at all times his client.

Crow testified that he had complaints from the trustees of the Teamsters Trust regarding Borders' acquisition of a fax machine and his interfering in the trust's business. He also noted that

the Trust complained about Borders's misrepresentation of coverage under a disability policy.

Crow testified that he had no choice but to terminate Borders because he had been given an ultimatum by members of the Teamster's Trust to get rid of Borders or they would get rid of him. Crow stated he terminated Borders for cause in September of 1995 and that he owed him no more commissions and fees.

Crow stated that he agreed to pay Borders one-third on the group health insurance; however, Borders's main responsibilities were for the disability and the cancer insurance. Crow discontinued the disability and cancer coverage after he terminated Borders and went back to his original position, agent and consultant for the Trust. Crow testified that he continues his duties as agent and consultant on a daily basis, and he continues to be paid a monthly commission by the Teamsters Trust.

Crow presented the testimony of Dave Hodgin, chairman of the board of the Middle Tennessee Teamsters Trust, who stated that he had contacted Crow in late 1994 or 1995 upon his lawyer's advice that the trust needed a representative agent. Hodgin testified that he did not meet Borders until about nine months to a year after he contacted Crow. Crow introduced Borders to Hodgin when Hodgin expressed a need for cancer and disability insurance. Hodgin testified that in a presentation, Borders told employees of two companies represented by the Teamsters Trust that the disability and cancer insurance would be integrated with the workman's compensation payments. Problems arose when a worker was hurt on the job and was told by the insurance company that their policy did not pay when he was off work receiving worker's compensation, in other words, was not an integrated policy. Hodgin contacted Crow about the problem he perceived had been caused by Borders, and Crow was able to persuade the insurer to reissue the policies removing the exclusion.

Hodgin further testified to another incident in which Borders allegedly ordered a new fax machine for the Teamsters Trust office that had not been approved. Hodgin stated that Borders was causing problems, and that he told Crow that "Harry had to go." Hodgin stated that at that point he would have terminated the affiliation with Crow. Hodgin testified that the Teamsters Trust filed a complaint alleging theft against Adminitron, the third party administrator obtained by Borders.

Crow presented the testimony of Jimmy Ray White, a business agent for the Teamsters and a Trustee of the Middle Tennessee Trust. White testified that he was present during one of the presentations made by Borders, and that Borders represented that the disability insurance would be integrated with the worker's compensation. White testified that he advised Crow in early 1995 that he would be terminated if Borders was not terminated. White claimed that his reasons included Borders's misstatements regarding the integrated disability insurance, Borders' ordering office equipment without authorization, and his opinion that Borders was obnoxious.

After the presentation of proof, the judge found that there was an agreement between the parties that Borders would receive one-third of the commissions and fees, not one-half, and that Borders was entitled to one-third of commissions and fees up until the time that he was discharged in October of 1995. The jury was so instructed. The judge also instructed the jury that they were

to determine if Borders was discharged for cause and to determine if Borders is entitled to funds after discharge. In instructing the jury, the trial court stated in pertinent part:

> Now, ladies and gentlemen of the jury, a contract for employment for an employee for an indefinite term is a contract at will and it can be terminated by either party at any time without cause. It is true, however, that when a person is working at will and is a sales person, and is on what is known as what is called residual commissions, may in some cases recovered all or a portion of residual commissions alleged to be owed after the employment. In determining the intention of the parties, one consideration is circumstances of the parties at the time the contract was formed. An unexpressed obligation may be implied where intended. The course of conduct is the strongest evidence of the original intent. But you may also consider such things, as I said before, the words of the oral contract, the custom of the business, the relationship of the two parties, and also to the customer involved in this lawsuit, who procured the original business, who was responsible for the business, who served the account and what time and what was the subject of serving the account in relation to who got the business. In other words, you may compare the act of serving the account, who got the business relationship between these two people and the Teamsters Trust.
>
> You may consider the relationship between Teamsters Trust and the two parties; you may consider malfeasance or negligence; you may consider other misconduct and you may consider competence.
>
> \* \* \* \* \* \*
>
> [I]f you find that the plaintiff was owed money before he was terminated, he's entitled to those damages, period. As a matter of law he's entitled to those damages up until the time you find he was discharged and whether or not he was actually paid for the date of discharge, that is in dispute, as well as the date of discharge. As to whether or not he's entitled to any residual commissions, the total amount claimed or any portion thereof, or none thereof, is entirely up to you.

The record indicates that during deliberation, the jury asked two questions. The first question was: "[c]an we have a legal definition of termination for cause as defined under the state statute?" The trial judge responded "[t]here is no applicable definition for termination of cause. There are many cases that decide whether a person was discharged or not discharged [for cause]....in this case, the termination for cause is a question for you to decide. There is no definitive guideline." The second question was:

> [i]f we find that the plaintiff was terminated for cause, can we still award commissions and fees from the time he was terminated. If so, is there any set amount or must we still award commissions and fees from the time he was terminated. If so, is there any set amount or must we use a collective best judgment.

The trial judge responded:

> [y]es, you still may award the plaintiff if you collectively and unanimously feel he is entitled to commissions and fees. Likewise, you may also determine that he is not entitled to fees and commissions. But that decision must also be unanimous.
>    If you decide to award the plaintiff commissions and fees, it's totally up to you ...it's not necessarily a fixed sum, but a sum you collectively believe to be fair under the circumstances of the case.

After deliberation, the jury found in favor of Borders in the amount of $6,000.00 for commissions and interest not paid before his termination.[3] In addition, the jury found that Borders was dismissed for cause, but was due one-third commissions and fees in the amount of $92,133.00 on the group life and health plan for the time period of October 1, 1995 to May 1, 2000. The jury verdict totaled $98,133.00 in favor of Borders.

Thereafter, Crow filed a motion for a judgment notwithstanding the verdict, a new trial, or a suggestion of remittitur. On July 15, 1999, the trial court ordered "that the verdict to the jury be and is hereby reduced from $98,133.00 to $30,000.00, and if the plaintiff declines to accept this remittitur, a new trial shall be allowed." Borders filed a notice stating that "he will reluctantly accept the suggestion of remittitur offered by the court if the defendant fails to appeal this case; otherwise, the plaintiff will also appeal so that the jury verdict will be reinstated." Both parties filed notices of appeal on August 16, 1999. On October 13, 1999, this Court entered an order stating that an order suggesting remittitur is provisional only and is not self-executing. Therefore, even though the plaintiff had filed a qualified notice of acceptance as an acceptance under protest, the trial court had not yet entered an order unconditionally reducing the amount of the judgment, and judgment was not final. The trial court entered a final order on November 11, 1999 denying Crow's motion for judgment notwithstanding the verdict or for a new trial but finding that the $98,133.00 jury verdict was outside the range of reasonableness, and thereby reduced the jury verdict from $98,133.00 to $30,000.00 plus the costs. Both parties have appealed.

The issues raised on appeal by appellant Borders are, as stated in his brief:

> I        Did the Trial Court err in granting a remittitur from $98,133.00 to $30,000.00?

---

[3] Crow does not take issue with this part of the judgment.

-8-

II      Should the Court of Appeals reinstate the verdict of the jury and award damages for the Defendant's appeal?

In addition appellee Crow raises one issue on appeal, as stated in his brief:

III     The trial court made three, key factual findings: (a) that Mr. Borders was Mr. Crow's employee at will who, (b) was terminated for cause and who, ( c) did not procure certain business in dispute.  Given these findings, did the trial court err as a matter of law in failing to order a complete remittitur of jury's verdict that Mr. Crow owes Mr. Borders post-termination commission from the disputed business?

We perceive the dispositive issue to be whether the trial court erred in denying the motion for judgment notwithstanding the verdict as to the claim for compensation after the date of termination.  Or to put it another way in the particular stature of this case, is there any material evidence to support the jury verdict for post-discharge compensation.

The rules for considering post-trial motion for a judgment notwithstanding the verdict are well known.

> A post-trial motion for the entry of judgment in accordance with a motion for a directed verdict made during the trial must be gauged by the usual rules relating to directed verdicts.  Those rules require that the trial judge, and the appellate courts, take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence.  A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion.

*Holmes v. Wilson*, 551 S.W.2d 682, 685 (1977).

While the record does reflect that there was an agreement between the parties for Borders to assist Crow in formulating and servicing the insurance needs of the Trust and was to be either at the rate of fifty percent of Crow's fees and commissions or a one-third of Crow's fees and commissions for this service, the record is void of any evidence of any other terms of the contract. The trial court instructed the jury that the contract between Borders and Crow was a contract terminable at will, and that it could be terminated by either party any time with or without cause. It is undisputed that the business itself was procured by Crow, and the evidence reflects that Borders was hired for his expertise in servicing and administration of the requirements of Crow's contract with the Trust Fund. We need not consider whether in a contract terminable at will Borders would be entitled to compensation from and after his discharge, because in the present case the jury determined that

Borders was discharged for cause.

In ***Nelson Trabue, Inc. v. Professional Management-Automotive, Inc.***, 589 S.W.2d 661 (Tenn. 1979), the question involved was whether a corporate manager employee is entitled to compensation for services for the full term of its contract, even though there was a discharge for cause by the employer. ***Id.*** at 661. In holding that the corporate manager was not entitled to the balance of the annual compensation through the term of the contract, the Court said:

> The general rules with regard to contracts of employment are well settled. They are stated in the case of ***Little v. Federal Container Corp.***, 61 Tenn. App. 26, 452 S.W.2d 875 (1969) as follows:
>
>> "Generally, a contract of employment for an indefinite term is a contract at will and may be terminated by either party. [citations omitted]. Whereas, a contract for a definite term may not be terminated before the end of the term, *except for cause* or by mutual agreement, unless the right to do so is reserved in the contract. 56 C.J.S. Master and Servant § 30, p. 411.
>>
>> "An employer has the right to discharge an employee at any time for just cause. The fact the employer bears with the incompetency or irregularities of such employee for a time does not estop the employer from discharging the employee for such incompetency if it continues." 61 Tenn. App. at 31-32, 452 S.W.2d at 877-78.
>
> In the earlier case of ***Jackson v. The Texas Company***, 10 Tenn.App. 235, 244 (1929), it was held that even where an agency is for a definite term, the principal has a right to revoke it before the expiration of the term without incurring liability for damages because of the failure of the agent faithfully to perform his express or implied undertakings.

***Id.*** at 663.

If, as held in ***Nelson Trabue***, an employee in a contract for a definite term is not entitled to post-discharge compensation if discharged for cause, it necessarily follows that in a contract terminable at will, a discharge for cause precludes post-discharge damages. Although the trial court incorrectly instructed the jury in this regard, neither party has raised the incorrect jury instruction as an issue for review.

Accordingly, we find that there is no material evidence to support the jury verdict awarding plaintiff damages for post-discharge compensation. Therefore, that part of the judgment awarding post-discharge damages is vacated, and the case is remanded to the trial court for entry of a judgment on the jury verdict in the amount of $6,000.00 for compensation due to the date of termination. Costs of the appeal are assessed one-half to appellant, Harry Borders, and one-half to appellee, Ronnie J. B. Crow.