**Siddharth SHAH and Daksha Shah, d/b/a Yera's Raceway, Plaintiffs**

v.

**RACETRAC PETROLEUM, INC., Defendant**

**No. 3:99–CV–410.**

United States District Court, E.D. Tennessee, Northern Division.

July 31, 2001.

and La Mantia, Raleigh, NC, for Siddharth Shah dba Yera's Raceway, Daksha Shah dba Yera's Raceway, plaintiffs.

Debra L Fulton, Frantz, McConnell & Seymour, Knoxville, for Racetrac Petroleum Company, defendant.

## MEMORANDUM OPINION

JARVIS, District Judge.

In this diversity action [1], plaintiffs Siddharth and Daksha Shah ("plaintiffs" or "the Shahs"), husband and wife, d/b/a Yera's Raceway, seek $579,000 in compensatory damages and $15 million in punitive damages from defendant Racetrac Petroleum, Inc. ("RPI"), arising from the termination of the parties' business relationship regarding a convenience store known as Raceway 773 located at 2003 E. Broadway in Maryville, Tennessee. It is undisputed that RPI utilized the 30–day termination clause of the contract documents to end, at that time, the parties' almost 14–month long business relationship and that it did so in order to sell Raceway 773 to Downey Oil Company, Inc. ("Downey Oil"). The Shahs primarily contend that they were told by RPI representatives that RPI would never terminate a relationship with a contract operator except for a serious failure to perform. Given these representations, the Shahs allege, in their second amended complaint ("complaint"),[2] the following state law causes of action:

(1) Breach of contract, including the implied covenant of good faith and fair dealing;

Jay W Mader, Arnett, Draper & Hagood, Knoxville, Mark La Mantia, Farrell

1. Plaintiffs are citizens of the State of Tennessee, and defendant is a Georgia corporation doing business in Tennessee. Jurisdiction is therefore predicated upon 28 U.S.C. § 1332(a)(1) and is not in dispute.

2. Not only is this the third complaint filed in this lawsuit [see Docs. 1 (attachment), 5, and 45], but also this is the third lawsuit filed in this court. On December 9, 1996, the Shahs filed their first complaint against RPI in the Circuit Court for Blount County, Tennessee [see Doc. 1 (attachment) in 3:97–cv–266]. RPI then removed the action to this court on April 10, 1997, when it was assigned to the undersigned for all further proceedings. On February 3, 1998, the parties, pursuant to Fed.R.Civ.P. 41(a)(1), entered a joint stip-

(2) Promissory estoppel;

(3) Promissory fraud; and

(4) Fraudulent or negligent misrepresentation.

The Shahs also allege that RPI has violated the Tennessee Petroleum Trade Practices Act (TPTPA), Tennessee Code Annotated §§ 47–25–601, *et seq.*, and the Tennessee Consumer Protection Act (TCPA), Tennessee Code Annotated §§ 47–18–101, *et seq.*[3]

This matter is presently before the court on the following motions filed by RPI:

(1) Motion to dismiss or, in the alternative, for summary judgment [Doc. 14];

(2) Motion for summary judgment on punitive damages [Doc. 38]; and

(3) Motion for summary judgment on limiting damage proof [Doc. 58].

The issues raised have been exceptionally well briefed by the parties [*see* Docs. 15, 20, 31, 39, 56, 59, 60, 61, 62, and 65].[4] The court also heard oral argument on some of these issues on August 1, 2000. For the reasons that follow, RPI's motion for summary judgment will be granted, and this case will be dismissed. Consequently, RPI's remaining motions will be denied as moot.

## I.

### Facts

The facts of this case will be viewed in the light most favorable to the Shahs. In late 1994, the Shahs became interested in purchasing a business for investment purposes. One of the businesses considered and investigated by the Shahs was Raceway 773, then operated by Clyde and Gloria Holt. The Holts indicated they would sell that business, including certain interior improvements, inventory, and goodwill, for $90,000.[5]

---

ulation of dismissal without prejudice. On February 2, 1999, the Shahs filed a second complaint in the Circuit Court for Blount County, Tennessee, this time including Downey Oil as a defendant along with RPI [*see* Doc. 1 (attachment) in 3:99–cv–119]. On March 3, 1999, RPI removed the action to this court and that case was assigned to the Honorable R. Leon Jordan for all further proceedings. On June 4, 1999, Judge Jordan filed a memorandum and order [Doc. 15 in 3:99–cv–119] in which he remanded that action to the Circuit Court for Blount County, Tennessee, because of lack of subject matter jurisdiction. In particular, Judge Jordan held that the complaint did not state a cause of action under the Petroleum Marketing Practices Act, 15 U.S.C. § 2804, thereby eliminating the only federal cause of action in that case. Moreover, as Downey Oil was a Tennessee corporation, there was no diversity jurisdiction because the Shahs too were citizens of Tennessee. On July 21, 1999, the state court dismissed the action against Downey Oil. On August 2, 1999, RPI timely removed the action to this court because diversity jurisdiction now existed between the remaining parties. Once again, the undersigned was favored with the assignment of this lawsuit.

3. In one of its briefs, RPI contends that the Shahs have alleged that RPI violated the "federal Petroleum Marketing Practices Act (PMPA)", presumably 15 U.S.C. § 2804 [*see* Doc. 59, p. 1]. The second amended complaint does not state a cause of action under the PMPA; rather, it is the court's recollection that the court, *sua sponte*, raised an issue either during oral argument or at some point thereafter as to whether some of the Shahs' causes of action might be preempted by the PMPA. The court therefore requested the parties to brief that particular issue, and they have now done so [*see* Docs. 59, pp. 8–15, and 62, pp. 3–5].

4. In fact, approximately 140 pages of briefs have been filed regarding these issues, as well as a considerable number of exhibits and affidavits.

5. In their amended and restated complaint, the Shahs allege that $30,000 of this amount represents inventory and $60,000 represents goodwill [*see* Doc. 5, ¶¶ 22 and 32]. Such a division between inventory and goodwill is

The Shahs first learned that Raceway 773 was for sale from Bhanu Mehta, who was also considering its purchase. In his preliminary investigation of Raceway 773, Mr. Mehta examined both the lease and the contract under which the Holts rented and operated Raceway 773 with RPI. After examining those documents, Mr. Mehta discovered that each instrument contained a 30–day termination clause. Mr. Mehta asked Mr. Holt about the termination clause, and Mr. Holt informed him that RPI would not terminate the lease or the contract as long as the operator made rental payments on a timely basis and operated the business in a satisfactory manner. Mr. Mehta also inquired about the termination clauses from other RPI operators and was likewise informed by them that RPI would not terminate the lease or contract as long as the operator paid the rent on time and maintained the business in a satisfactory manner.

In December 1994, the Shahs personally examined the lease between the Holts and RPI regarding Raceway 773. Like Mr. Mehta, the Shahs expressed concern to Mr. Holt over investing money in a business from which they could be removed upon 30 days notice. In response, Mr. Holt informed the Shahs that, "As long as you perform to [RPI's] satisfaction they never kick anybody out." [See Doc. 19, Ex. A, p. 35 (Siddharth Shah dep.) ]. The Shahs also inquired about the termination clause with RPI's district manager at that time, J.D. Main [6]. According to Mr. Shah's testimony, Mr. Main advised him that, " 'Racetrac [sic] policy is that they will not kick any dealer out as long as they perform satisfactorily.' " [See id., p. 77].

Additionally, the Shahs spoke with the soon-to-be district manager for RPI, James Smith. Mr. Shah again expressed his concern over the 30–day termination clause and stated that any money invested into Raceway 773 would be "very high risk if Racetrac [could] kick me out within 30 days [of] me [sic] purchasing the store." [See id., p. 49]. According to Mr. Shah, Mr. Smith responded:

Racetrac operates their business as a family. Racetrac never kick [sic] any dealer out from that business as long as it perform [sic] satisfactorily.

[See id., p. 50].

Nevertheless, Mr. Shah was concerned and requested a five or ten-year lease instead of RPI's standard one-year lease. [See id., p. 66]. According to Mr. Shah's testimony, Mr. Smith advised him verbatim as follows:

Racetrac will not permit any changes into [sic] this agreement. . . . Don't worry about it, Mr. Shah, you will not have any problem if you perform right.

[See id.]. Mr. Smith also counseled the Shahs to check with other RPI operators regarding RPI's reputation. The Shahs did so and received similar assurances from those operators, such as Nayan Shah. The Shahs began to move forward with the transaction to buy Raceway 773 and completed a credit report in January 1995.

On February 7, 1995, the Shahs purchased the business from the Holts. In doing so, the Shahs executed a confirmation of purchase and sale agreement with the Holts, paying them a total purchase price of $81,172.59.[7] Regarding the transaction with RPI, the Shahs executed a document package including, but not limit-

---

not discussed in the second amended complaint.

**6.** Mr. Main is now deceased [see Doc. 19, Ex. L, Response to Interrogatory # 8].

**7.** The Shahs had previously tendered $5,000 in earnest money to the Holts, so that they paid the remaining $76,172.59 on the execution date.

ed to, a lease and contract, each containing the 30–day termination clause. Prior to executing these documents, Mr. Shah once again expressed concern about the termination clause to Mr. Smith, who assured him again that, "If you perform right we will not kick you out." [*See id.,* p. 62].

After the execution of the document package between RPI and the Shahs, Mr. Smith telephoned the general manager of RPI stores, Floyd Philpot. Mr. Smith introduced the Shahs to Mr. Philpot, and Mr. Philpot welcomed the Shahs to "the Racetrac family." [*See id.,* p. 56–57]. Mr. Philpot also reiterated to the Shahs that, "there will not be a problem as long as we [the Shahs] perform satisfactorily." [*See id.,* p. 67].

Regarding the contract and lease entered into between the Shahs and RPI, certain key provisions must be set forth for purposes of analyzing the relevant legal issues. The initial language of any import is highlighted above the word "CONTRACT" on the first page:

THIS CONTRACT DOES NOT CREATE A FRANCHISE RELATIONSHIP UNDER STATE OR FEDERAL LAW (See Paragraph C)

[*See* Doc. 14, Ex. 2 to Ex. A, p. 1]. Paragraph C then sets forth the separate "No Franchise" provision:

C. *No Franchise.*—Contractor [the Shahs] acknowledges that this Contract does not create, extend, or renew a franchise under any local, state, or federal law including the Federal Petroleum Marketing Practices Act (PMPA). Contractor further acknowledges that this Contract with Contractee [RPI] is a separate and distinct contract and is not associated with any other agreements, contracts, or franchise relationships which may now or hereafter exist between Contractee and Contractor. Contractor further acknowledges that Contractee is the retailer of the fuel facility

to be operated hereunder and that this Contract does not give any rights to the Contractor as a fuel retailer. Contractor further acknowledges that this Contract cancels any existing leases, agreements or other contracts, except any lease, agreement or contract of same date, or any ground lease on the Premises between the parties, that may have existed between Contractee and Contractor.

[*See id.,* pp. 2–3].

With respect to title to the fuel, the contract provides:

F. *Gasoline and Payment Obligations.*—Contractee owns and retains all title to the fuel at the property until sold to the customer. Contractor agrees that all funds collected for fuel sales are the property of the Contractee and further agrees to act as the agent of Contractee in the collection and safe keeping of all monies collected for sale of fuel. Contractor acknowledges that he owes a duty of trust to Contractee in the collection and safe keeping of all funds collected for sales and acknowledges that he holds himself in such fiduciary relationship to Contractee. Contractor agrees to remit funds so held in trust to Contractee upon demand or otherwise as directed by Contractee in cash or by cashier's check.... In addition, Contractor shall submit all books and records relating to the sale of fuel and gasoline products purchased from Contractee for an audit and taking of inventory....

[*See id.,* pp. 3–4].

The termination clause of the contract specifically provides:

E. *Term of Contract and Renewal.*— This Contract shall be for a duration of twelve (12) months from date of execution, provided the Contractor complies with all the terms and conditions and

covenants herein, it being the intent of the parties that the term of this Contract will run concurrently with the term of the Lease executed as of even date herewith. Provided that there has been no default as defined in this Contract within the existing term of the Contract, this Contract will be automatically renewed and the term of the Contract extended for subsequent one year terms. *At any time during the initial or any extended term, either party may give thirty (30) days written notice in the form hereinafter described of its intent to terminate the Contract.* Any such extension shall be upon the same terms and conditions as stated herein.

[*See id.*, p. 3 (emphasis added)]. The termination clause in the lease is substantially the same, providing as follows:

2. *TERM.* This Lease shall be effective on the 7th day of February, 1995, and subject to all its terms and conditions shall remain in full force and effect for twelve (12) months from date of execution. Upon termination of lease term, this Lease will be automatically renewed for subsequent one-year terms upon the same terms and conditions, subject to Lessor's (RPI's) adjustments of the rental provided, however, *that at any time during the initial or any extended term, either party may give thirty (30) days written notice in the form hereinafter described of its intent to terminate this Lease.* Lessee acknowledges that this Lease does not create, extend or renew a franchise under any local, state or federal law including the Federal Petroleum Marketing Practices Act (PMPA).

[*See id.*, Ex. 1 to Ex. A, pp. 1–2].

Turning again to the contract, that document contains the following termination or merger provision:

Y. *Entirety.*—This Contract, together with attached exhibits, and any other lease or contract executed the same date, constitutes the entire understanding between the parties and supersedes and cancels all previous contracts between the parties with respect to the facilities covered hereby.

[*See id.*, Ex. 2 to Ex. A, p. 16]. That paragraph is reiterated in substantial form in the miscellaneous provision as follows:

Z. *Miscellaneous.*—

.　　.　　.　　.　　.

5. This Contract supersedes and cancels are previous contracts or arrangements between the parties relating to the matters herein and no prior or subsequent stipulation, agreement or understanding, verbal or otherwise, of the parties or their agents relating to the matters herein shall be valid or enforceable unless embodied in the provisions of this Contract, or a separate instrument in writing.

[*See id.*, p. 17].

After executing the lease and contract and after purchasing the business, the Shahs began investing money in Raceway 773. For example, the Shahs installed a surveillance system, made improvements to the coolers, increased inventory of certain products for promotional activity, and cut an overhang wall. In fact, prior to making the additional expenditures for cutting the overhang wall and again prior to doing so regarding the promotional activity, the Shahs asked Mr. Smith whether their performance was adequate so that RPI would not terminate the business relationship. In response, Mr. Smith advised the Shahs both in May and again in December 1995 that they had a satisfactory performance history so that they did not have to worry about RPI terminating the business relationship.

On January 20, 1996, however, Mr. Smith telephoned the Shahs and informed

them that RPI "got an offer" to buy Raceway 773 [see Doc. 19, Ex. A, pp. 93–94].[8] Although Mr. Smith did not disclose the identity of the entity which made the counter-offer or the date of the acceptance, discovery has revealed that Downey Oil made a counter-offer on December 27, 1995 [see Doc. 19, Ex. E (Plaintiffs' Ex. 5)]. Additionally, during that telephone conversation, Mr. Smith advised the Shahs that they could bid on the property, but he did not provide them with any specific terms or other information necessary to assist the Shahs in formulating a bid, other than to advise them that they would be required to tender $1,000 in earnest money with their bid. The Shahs requested that RPI send them information in writing; nevertheless, because they never received any written information, they made no bid on Raceway 773.

At this point, it must be emphasized that Mr. Smith has testified that he had no knowledge that RPI was attempting to sell Raceway 773 until around January 22, 1996 [see Doc. 39, attachment, p. 47].[9] Mr. Smith testifies further that he had not even heard a rumor that Raceway 773 was for sale before that date [see id.]. Mr. Smith also testifies that he has no involvement with the sale of stores, including those stores within his district [see id., p. 46]. Finally, Mr. Smith testifies that he only learns a store is for sale when Mr. Philpot informs him [see id., p. 47].

On March 27, 1996, RPI provided the Shahs with a letter serving as the "30–day notice of cancellation as provided in your Lease and Contract for the Raceway store located at 2003 East Broadway, Maryville, Tennessee." [See Doc. 19, Ex. N]. The Shahs vacated Raceway 773 on April 29, 1996, almost 15 months after they began operating that store.

Other evidence has surfaced during the discovery phase of this litigation which, according to plaintiffs, must be considered by the court in analyzing the pending motions. On February 10, 1995, three days after the execution of the various contract documents, Jackie Russell, the Asset Manager in the Real Estate Department of RPI, mailed a bid package of RPI stores for sale, which included Raceway 773, to Tommy Thompson, the President of Fast Petroleum, Inc., located in Dalton, Georgia [see Doc. 19, Ex. E, Plaintiffs' Ex. 3; see also Russell dep., pp. 83–84]. Plaintiffs also emphasize the following language in Ms. Russell's correspondence to Fast Petroleum: "In visiting the stores, please use discretion as our field employees or our Contract operators are not aware of this offering." [See id.]. According to Ms. Russell's testimony, RPI did not want either its store employees or the contract operators to be cognizant of the fact that a store was for sale. [See id., pp.27–28]. In fact, when RPI had not received a bid from Mr. Thompson by April 19, 1995, RPI required him to return all of the information previously submitted to him pursuant to the Confidentiality Agreement executed by him [see id., Plaintiffs' Ex. 4]. Ms. Russell testified further that it was Mr. Philpot's decision to conceal from the contract operator of the store the fact that RPI is attempting to sell that store [see id. at p. 29]. Ms. Russell also testified that RPI would sell Raceway 773 at any time "[i]f the money's right." [See id. at p. 35]. RPI

---

**8.** Although Mr. Shah testifies that Mr. Smith told him RPI "got an offer," it appears to the court that, more accurately, what occurred was that Downey Oil made a counter-offer regarding RPI's earlier offer to sell. Therefore, this opinion will discuss the facts from that standpoint.

**9.** Mr. Smith was not certain about that date; Mr. Shah, however, testified without hesitation that it occurred at 3:30 p.m. on January 20, 1996 [see Doc. 19, Ex. A, pp. 93–94].

also admits that it had tried to sell Raceway 773 both in 1992 and again in 1994 to members of the Tennessee Oil Marketers Association [*see id.*, Ex. L (Answer to Interrogatory # 7) ].

In addition to selling Raceway 773, discovery has revealed that RPI sold Raceway 891 in Lenoir City, Tennessee, to Pilot Oil Company in 1996, and that it sold Raceway 778 in Mint Springs, Virginia, to another oil company in 1997. The evidence indicates further that RPI utilized the 30–day termination clause to terminate its lease and contract with the contract operators of those stores.

## II.

### Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988) (quoting Fed.R.Civ.P. 56(c)). The burden on the moving party may be discharged if the moving party demonstrates that the non-moving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Although the moving party bears the initial burden, it need not support its motion with affidavits or other materials *"negating"* the opponent's claim. *Id.* at 323, 106 S.Ct. 2548 (emphasis in original); *Adcock v. Firestone Tire & Rubber Co.*, 822 F.2d 623, 626 (6th Cir.1987). Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548.

Once the moving party carries its initial burden of showing that no genuine issues of material fact are in dispute, the burden shifts to the non-moving party to come forward with specific facts to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.* However, the non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. The non-moving party must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505.

Upon review of all of the evidence relevant to the motion for summary judgment, a court should, after viewing the evidence in the light most favorable to the non-moving party, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505; *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir.1991), *cert. denied*, 503 U.S. 939, 112 S.Ct. 1481, 117 L.Ed.2d 624 (1992). Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial—whether, in other words, there are

any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505; *Stein v. National City Bank,* 942 F.2d 1062, 1064 (6th Cir.1991).

## III.

### *The Tennessee Petroleum Trade Practices Act (TPTPA)*

■ In paragraph 42 of the complaint,[10] plaintiffs allege violations of the TPTPA. If the TPTPA is applicable to the facts of this case, then RPI, the alleged producer, would have been statutorily mandated to have given plaintiffs, the alleged dealer, 60 days notice—as opposed to 30 days notice—of its intention to terminate the contract and lease at issue. *See* T.C.A. § 47–25–604(a)(1) ("Any vertically integrated producer engaged in a franchise agreement with a dealer shall give sixty (60) days' notice to such dealer prior to termination or nonrenewal of such franchise agreement.").

As the preceding statute indicates, plaintiffs must satisfy three elements in order to trigger this longer termination provision: (1) RPI must be a vertically integrated producer; (2) there must be a franchise agreement between RPI and plaintiffs; and (3) plaintiffs must qualify as a dealer. Unless the court ignores or sets aside a number of provisions of the contract at issue, not one requirement is met.

The most significant impediment which plaintiffs must overcome in meeting the statutory requirements is the production of a franchise agreement. It is beyond cavil that RPI has made every effort to draft a contract which is anything but a franchise agreement. In fact, the follow-

ing prefatory language is set forth *above* the word "CONTRACT" on the first page:

> THIS CONTRACT DOES NOT CREATE A FRANCHISE RELATIONSHIP UNDER STATE OR FEDERAL LAW (See Paragraph C)

[*See* Doc. 14, Ex. 2 to Ex. A, p. 1]. Paragraph C then reinforces that statement under the heading "No Franchise":

> Contractor [plaintiffs] acknowledges that this Contract does not create, extend or renew a franchise under any local, state, or federal law including the Federal Petroleum Marketing Practices Act (PMPA).

[*See id.*]. The parties have quite clearly expressed their intention that this agreement not be construed by any court as a franchise agreement under any state law, including Tennessee. Thus, unless the language of the TPTPA mandates its application to the relationship between RPI and plaintiffs, Tennessee law otherwise allows the parties to define and express the nature of their relationship in this contract. *See, e.g., Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.,* 521 S.W.2d 578, 580 (Tenn.1975).

An examination of the parties' relationship, from the perspective of the TPTPA, indicates to the court's satisfaction that plaintiffs are not "dealers" and that RPI is not a "vertically integrated producer." Under the Tennessee statute, a dealer is defined as "any person, firm, corporation, or partnership engaged in the sale of petroleum products to the public at retail[.]" *See* T.C.A. § 47–25–602(2). The statute then defines the phrases "[s]ale at retail" or "sales at retail" or "retail sale" to mean "sale at retail, sales at retail, or retail sale as defined at § 47–25–202(4)[.]" *See*

---

**10.** There is a typographical error in the second amended complaint. Paragraph 42 mistakenly follows the first numbered paragraph 43, although preceding the second numbered paragraph 43.

T.C.A. § 47–25–602(9). T.C.A. § 47–25–202(4) states as follows:

> ... any transfer, made in the ordinary course of trade or in the usual prosecution of the seller's business, of *title* to tangible personal property to the purchaser for use or consumption and for a valuable consideration.

(Emphasis added).

As previously noted, the contract specifically states that RPI "owns and retains all *title* to the fuel at the property until sold to the customer." [*See* Doc. 14, Ex. 2 to Ex. A, ¶ F (emphasis added)]. The contract could not have been any more carefully crafted by RPI to avoid the application of the TPTPA. Pursuant to this specific provision of the contract, plaintiffs never possessed title to the fuel being sold at Raceway 773. Consequently, having never possessed that title, plaintiffs were unable to transfer title to the fuel to the purchaser. And, being unable to transfer that title, plaintiffs were never dealers within the scope of the TPTPA because they were not "engaged in the sale of petroleum products to the public at retail as defined by statute." Furthermore, for that very same reason, RPI was not a "vertically integrated producer" because by statute, RPI is required to be a "producer controlling all phases of petroleum production and sale from the well through distribution to *dealers* as defined herein." *See* T.C.A. § 47–25–602(11) (emphasis added). Thus, unless plaintiffs are dealers, RPI does not fall within the scope of the statutory definition of a "vertically integrated producer."

Additionally, in analyzing the definition of "dealer" under the TPTPA, the court has reviewed federal cases construing who is considered a "retailer" for purposes of the PMPA because those terms seem to be essentially the same. For example, in *Miller v. W.H. Bristow, Inc.*, 739 F.Supp. 1044 (D.S.C.1990), the court held that plaintiff, who sold motor fuels obtained through a "retail consignment basis" from the defendant, was not a "retailer" for purposes of the PMPA because he did not purchase fuel products from the defendant. *Id.* at 1048. In so holding, the court emphasized the following facts: (1) defendant retained title to the gasoline until the customer pumped it into his vehicle; (2) defendant paid all taxes on the fuel and the property; (3) defendant set the price for the fuel and made all business decisions relating to the sale of the fuel; (4) defendant owned and maintained the fuel dispensing equipment; and (5) defendant assumed the entrepreneurial risk. 739 F.Supp. at 1048.

Here, all factors, except perhaps the last one, cut in favor of RPI. As previously stated, the contract specifically provides that RPI would retain title to the gasoline until the customer pumped it into his vehicle. Additionally, as outlined in the affidavit of Mr. Philpot, RPI "paid the taxes associated with the sale of fuel." [*See* Doc. 14, Ex. 1, ¶ 9]. Mr. Philpot testifies further that RPI "set the price for the gasoline." [*See id.*, ¶ 10]. Mr. Philpot also testifies that RPI "maintained the equipment directly connected with the sale of fuel." [*See id.*, ¶ 8]. Thus, employing the analysis set forth by the *Miller* court, the only factor arguably in favor of plaintiffs is the fact that they assumed some entrepreneurial risk. But, to some extent, so did RPI. At any rate, the court concludes that the analysis to determine whether one is a retailer for purposes of the PMPA is applicable to determine whether one is a dealer for purposes of the TPTPA. *See also Farm Stores, Inc. v. Texaco, Inc.*, 763 F.2d 1335 (11th Cir.1985) (similar analysis and holding); *Johnson v. Mobil Oil Corp.*, 553 F.Supp. 195 (S.D.N.Y.1982) (similar analysis and holding). Utilizing this analysis, the court concludes that plaintiffs are not dealers within the meaning of the TPTPA

(nor are they retailers within the meaning of the PMPA) so that the TPTPA is not applicable to this case[11]. RPI's motion for summary judgment on that issue must therefore be granted.

## IV.

### Breach of Contract

In the second-numbered paragraph 43 of the complaint, plaintiffs allege breach of contract, including a breach of the implied duty of good faith and fair dealing. Under Tennessee law, the rights and obligations of contracting parties are governed by their written agreements. *Hillsboro Plaza Enterprises v. Moon*, 860 S.W.2d 45, 47 (Tenn.Ct.App.1993). When the agreement is unambiguous, the meaning is a question of law, and the court must enforce the agreement according to its plain terms. *Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 557 (Tenn.Ct.App.1991). Moreover, a court "is not authorized to pervert language or exercise its creative powers to find other means for a term expressed with sufficient clarity to reflect the parties' intent." *First American National Bank v. Fidelity & Deposit Co.*, 5 F.3d 982, 985 (6th Cir.1993) (citing *Ballard v. North American Life & Casualty Co.*, 667 S.W.2d 79, 82 (Tenn.Ct.App. 1983)). In the absence of fraud or mistake, a contract must be interpreted and enforced as written even though it contains terms which may be thought harsh and unjust. *Frank Rudy Heirs Associates v. Sholodge, Inc.*, 967 S.W.2d 810, 814 (Tenn. Ct.App.1997) (citation omitted). Nor are courts "at liberty to relieve parties from their contractual obligations simply because these obligations later prove to be burden-

some or unwise." *Hillsboro Plaza Enterprises*, 860 S.W.2d at 47 (citations omitted).

In this case, plaintiffs do not dispute the fact that both the lease and the contract provide that "either party may give thirty (30) days written notice" to terminate the initial lease or agreement as well as any extended lease or agreement. Nor is there any dispute that RPI gave plaintiffs proper written notice of its intent to terminate both the lease and the contract. Hence, plaintiffs do not, and cannot, point to any specific provision of either the contract or lease which was breached. Rather, the sole vehicle by which plaintiffs attempt to salvage their breach of contract theory is based on fraud. Unless plaintiffs can raise a genuine issue of material fact relating to fraud, then plaintiffs' breach of contract cause of action must be dismissed. The court will address this issue shortly.

■ Before undertaking that analysis, however, the court will turn to plaintiffs' corollary theory of breach of the implied duty of good faith and fair dealing. In Tennessee, "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement ...." *TSC Industries, Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn.Ct.App.1987). Nevertheless, "[w]hat this duty consists of ... depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties ...." *Id.* Furthermore, "good faith or the lack of it may be an element or circumstance of recognized torts, or breaches of contracts, but it does not appear that good faith, or

**11.** It is for this same reason that the PMPA does not apply to the facts of this case. And again, plaintiffs do not allege a cause of action pursuant to the PMPA; rather, the court had raised the issue of whether the PMPA was applicable and, if so, whether it would preempt one or more of plaintiffs' state law causes of action. Furthermore, the court finds that the PMPA is inapplicable because Racetrac or Raceway trademarks are not owned or controlled by a refiner. *See* 15 U.S.C. § 2801(1)(A) and (B).

the lack of it is, standing alone, an actionable tort." *Solomon v. First American National Bank,* 774 S.W.2d 935, 945 (Tenn.Ct.App.1989). Finally, the implied duty of good faith and fair dealing cannot be breached by a party performing as "specifically allowed" in the contract. *Bank of Crockett v. Cullipher,* 752 S.W.2d 84, 91–92 (Tenn.Ct.App.1988).

■ Here, the court concludes that RPI did not breach a duty of good faith and fair dealing. For such a breach to exist, plaintiffs would have to point to a specific contractual provision violated by RPI. Plaintiffs are unable to do so because RPI utilized the termination provision "specifically allowed" in the lease and in the agreement. *See id.* Consistent with these provisions, RPI provided plaintiffs with 30 days written notice of its intent to terminate both the lease and the agreement. Consequently, summary judgment must be entered in RPI's favor on this purported cause of action.

## V.

### Fraud and Promissory Estoppel

In paragraphs 35, 36, and first numbered 43 of the complaint, plaintiffs allege various acts of fraud, promissory fraud, and misrepresentation. Moreover, as just mentioned, plaintiffs' cause of action for breach of contract is inextricably intertwined with their causes of action based on fraud. Again, unless plaintiffs can raise a genuine issue of material fact as to fraud, the contract and lease must be interpreted and enforced as written, even though it contains the 30–day termination clause which plaintiffs allege to be harsh and unjust. *See Frank Rudy Heirs Associates,* 967 S.W.2d at 814.

■ In Tennessee, actions for fraud contain four elements: (1) an intentional misrepresentation of a material fact; (2) knowledge of the representation's falsity; (3) an injury caused by reasonable reliance on the representation; and (4) the misrepresentation must involve a past or existing fact or, in the case of promissory fraud, involve a promise of future action with no present intent to perform. *Dobbs v. Guenther,* 846 S.W.2d 270, 274 (Tenn.Ct.App. 1992) (citations omitted). In their response, plaintiffs implicitly concede that they have only a cause of action for promissory fraud as opposed to other types of fraud involving past or existing facts [*see* Doc. 19, p. 1; *see also* Doc. 20, pp. 12–16].[12] In other words, plaintiffs allege that RPI made certain promises of future actions with no present intent to perform.

Even though the Tennessee Supreme Court has not yet adopted the doctrine of promissory fraud, it has clearly indicated a willingness to do so in a proper case if justice demands. *Fowler v. Happy Goodman Family,* 575 S.W.2d 496, 499 (Tenn. 1978). Without question, Tennessee intermediate appellate courts have embraced this particular tort. *See, e.g., Oak Ridge Precision Industries, Inc. v. First Tennessee Bank,* 835 S.W.2d 25, 28 (Tenn.Ct.App. 1992); *Stacks v. Saunders,* 812 S.W.2d 587, 592 (Tenn.Ct.App.1990).

■ In its discussion of promissory fraud, the Tennessee Supreme Court in *Fowler* observed as follows:

Under the majority view, in order for actionable fraud to be based upon a promise of future conduct, it must be established that such a promise or representation was made with the intent not to perform. A statement of inten-

---

**12.** Plaintiffs, of course, assert that there are genuine issues of material fact as to their other causes of action [*see* Doc. 19, pp. 1–2].

tion must be false and the intention not actually held.

575 S.W.2d at 499 (citations omitted). In outlining the type of evidence which must be demonstrated by the party asserting fraud, the Tennessee Supreme Court further observed that this burden could not be satisfied by plaintiffs' "subjective belief," *see id.*, and quoted the Restatement (Second) of Torts § 530, Comment (d) (1977), as follows:

> The intention of the promissor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of its nonperformance, nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into. The intention may be shown by any other evidence that sufficiently indicates it existed as, for example, the certainty that he would not be in funds to carry out his promise.

*Id.* n. 3.

Plaintiffs' proof in this case suffers from a similar deficiency because there is no evidence to suggest that RPI, at the time it executed the contract and lease, intended not to perform those agreements. Again, the contract and lease were for an initial term of 12 months, a provision which was more than completely fulfilled and honored by RPI. Under those circumstances, it is difficult to seriously argue that RPI did not intend to perform when it actually did so. And the fact that RPI was attempting to sell Raceway 773, along with many other businesses, a few days later does not alter the court's conclusion. An offer to sell simply reflects RPI's willingness to enter into an agreement to sell Raceway 773. But it has no impact upon this contract and lease until some entity accepts that offer, which did not occur until, at the earliest, sometime in December 1995. In fact, when Mr. Smith called

Mr. Shah on January 20, 1996, he informed Mr. Shah, even then, that RPI "might" or "might not" accept the offer [*see* Doc. 19, Ex. A, pp. 93–94]. In the meantime, RPI intended to, and in fact did, honor this contract and lease.

It is for this same reason that the cases relied upon by plaintiffs with respect to promissory fraud are readily distinguishable. For example, in *Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585 (Tenn. Ct.App.1980), plaintiff Peggy Brungard, an unknown, aspiring singer, entered into a recording contract with the defendant, whereby she would pay the defendant to produce her records. *Id.* at 587. Prior to the execution of the contract, defendant's representatives also indicated to plaintiff that they would actively promote and finance plaintiff's record. *Id.* The evidence at trial indicated that the defendant did not promote her record as plaintiff understood it would. *Id.* at 587–88. Furthermore, there was evidence to suggest that the defendant made several misrepresentations regarding how they would finance plaintiff's record. *Id.* at 590. Consequently, the appellate court upheld the chancellor's decision that plaintiff was entitled to recovery based on a theory of promissory fraud. *Id.*

Likewise, in *Steed Realty v. Oveisi*, 823 S.W.2d 195 (Tenn.Ct.App.1991), a real estate vendor induced several vendees to purchase real property by representing that he would build and maintain roads to a certain standard and provide water and electricity connections on the real property. *Id.* at 200. One purchaser even testified that the vendor had promised to build a clubhouse which would be turned over to the landowners once the subdivision was completed. *Id.* at 201. The evidence at trial, however, established that the vendor never intended to make these improvements. *Id.* Consequently, the appellate

court permitted the vendees to recover under a theory of promissory fraud. *Id.*

Here, by contrast, there is no evidence to suggest that RPI *never* intended to honor the contract and lease. It is undisputed that plaintiffs operated the business on the leased premises for almost 15 months after the contract documents were executed. In all likelihood, the parties would be engaged in business today but for the fact that RPI sold Raceway 773 to Downey Oil. Significantly, there was no firm acceptance of any offer to sell Raceway 773 by Downey Oil until almost a year after the contract and lease were executed by plaintiffs and RPI. This case is simply devoid of the requisite intent necessary to establish promissory fraud, as defined by Tennessee law, on behalf of RPI.

Another critical fact must be emphasized at this juncture. At some point during the initial negotiations, Mr. Shah requested to Mr. Smith that RPI eliminate the 30–day termination clause [*see* Doc. 19, Ex. A, p. 66]. Mr. Smith responded that he could not convert the lease to a five to ten-year lease because, " 'Racetrac will not permit any changes into this agreement.' " [*See id.*]. According to Mr. Shah's testimony, Mr. Smith told him that, " 'Racetrac policy is not to change the lease.' " [*See id.*]. Furthermore, even if this court considers Mr. Shah's testimony that Mr. Smith then told him that, " 'Don't worry about it, Mr. Shah, you will not have any problem if you perform right[,]' " [*see id.*], it matters not. At that point, Mr. Shah had notice of Mr. Smith's lack of authority to vary the lease so that Mr. Smith's representations about future action by RPI are not binding on RPI.

This situation is remarkably similar to the facts of *Jackson v. The Texas Company,* 10 Tenn.App. 235 (1929), in which the representative of an oil and gas distributor presented plaintiff with an agency contract containing a clause which allowed the dis-tributor to terminate employment "at will and with or without cause ...." *Id.* at 240. Not surprisingly, plaintiff objected to the clause but was told by the distributor's representative not only that he did not have authority to change the contract, but also that the contract would not be canceled "so long as a man was behaving and carrying on his business properly ...." *Id.* The Tennessee Court of Appeals upheld the dismissal of plaintiff's action for wrongful termination, observing as follows:

> However it is admitted by Jackson that the agent stated that he had no authority to change the written contract and that the company would fire it back and not execute it should a change be made, as hereinabove stated. This put Jackson upon notice of the agent's want of authority.... We think that when this agent told Jackson that he had no authority to change the written contract that this was sufficient to put Jackson upon inquiry and to make it his duty as an honest and prudent man to inquire concerning the authority of an agent who made such a statement.

10 Tenn.App. at 243–44.

Likewise, this court is of the opinion that Mr. Smith's lack of authority to change the lease should have put Mr. Shah on notice as to Mr. Smith's lack of authority to make a representation to the effect that RPI would not terminate a relationship with an operator as long as he paid the rent on time and maintained the business in a satisfactory manner. Thus, while agreeing with plaintiffs that the theory of promissory estoppel is viable in the State of Tennessee, the court concludes, as a matter of law, that this theory is not available to plaintiffs under the facts of this case, even when viewing those facts in a light most favorable to plaintiffs.

Plaintiffs' arguments relating to promissory fraud also dovetail with their position

with respect to the parol evidence rule. In particular, plaintiffs contend that this rule does not apply to allegations of fraudulent misrepresentation inducing a party to contract because plaintiff is suing on a tort theory rather than a contract theory. *See, e.g., Brungard,* 608 S.W.2d at 588. Hence, plaintiffs contend they should be allowed to introduce Mr. Smith's statements into evidence despite being parol in nature.

▆ In Tennessee, "parol evidence is inadmissible to contradict, vary, or alter a written contract where the written instrument is valid, complete, and unambiguous absent fraud or mistake or any claim or allegation thereof." *Airline Construction, Inc. v. Barr,* 807 S.W.2d 247, 259 (Tenn.Ct. App.1990). Furthermore, in Tennessee, the parol evidence rule "is not a rule of evidence merely, but is a rule of substantive law" intended to protect the integrity of written contracts. *Maddox v. Webb Construction Co.,* 562 S.W.2d 198, 201 (Tenn.1978).

> The parol evidence rule is founded upon the principle that when the parties have discussed and agreed upon their obligations to each other and reduced those terms to writing, the writing, if clear and unambiguous, furnishes better and more definite evidence of what was undertaken by each party than the memory of man, and applies to exclude extrinsic utterances when it is sought to use those utterances for the purpose for which the writing was made, such writing superseding them as the legal act. The instrument itself is regarded as the best evidence of what the parties intended, and the writing still remains the best evidence of the understanding of the parties, even though, through a defect of form or by reason of some positive provision of law, it cannot have the effect intended for it. No other language is admissible to show what the parties meant or intended, for the reason that

each has made the instrument the agreed test of his meaning and intention. The rule rests upon a rational foundation of experience and policy and is essential to the certainty and stability of written obligations. It is designed to permit a party to a written contract to protect himself against perjury, infirmity of memory, or the death of witnesses. It has been said that while its application may on occasion seem to work injustice, on the whole it works for good. On the other hand, the rule has been described as 'mysterious' and as 'the most discouraging subject in the whole field of evidence.' But whatever the courts or textwriters may think of the rule, it is now universally accepted and is prescribed in some states by statute.

*Tri–Cities Forklift v. Conasauga River,* 700 S.W.2d 548, 550 (Tenn.Ct.App.1985) (*citing with approval* 30 Am.Jur. *Evidence,* Sec. 1016, p. 151). It must be emphasized that the Court of Appeals in *Tri–Cities,* after refusing to consider improperly introduced parol evidence, enforced the terms of the written lease between the parties and reversed the trial court. *Id.* at 550–51.

▆ Nevertheless, plaintiffs distinguish *Tri–Cities* from the instant case, pointing out that the party alleging a parol agreement in *Tri–Cities* made no assertion of fraud as they have done in this case. *Id.* at 548. The law in Tennessee, however, is well settled that "[p]arol proof of 'inducing representations' or 'collateral agreements' to the written contract must be limited to subject matter which does not *contradict* or *vary terms* which are plainly expressed in the writing." *Whelchel Co. v. Ripley Tractor Co.,* 900 S.W.2d 691, 693 (Tenn.Ct. App.1995) (*citing Airline Construction, Inc.,* 807 S.W.2d at 259) (emphasis in original).

■ Moreover, the "parol evidence rule is particularly applicable if the contract at issue contains an integration or a merger clause." *Schaeffer v. American Honda Motor Co., Inc.*, 976 F.Supp. 736, 741 (W.D.Tenn.1997) (applying Tennessee law) (citations omitted). The principle of merger, or more accurately integration, states that prior or contemporaneous negotiations and agreements are integrated into a contract intended by the parties to be a complete expression of their agreement. It is part of the rationale for the parol evidence rule. *Strickland v. City of Lawrenceburg*, 611 S.W.2d 832, 838 (Tenn.Ct. App.1980); *Brunson v. Gladish*, 174 Tenn. 309, 315–16, 125 S.W.2d 144, 146–47 (1939); *Restatement (Second) of Contracts*, § 213 (1979); 9 J. Wigmore, *Evidence in Trials at Common Law*, § 2425 (Chadbourn Rev. 1981); 3 A. Corbin, *Corbin on Contracts*, § 573 (1960).

The immeasurable difficulty with plaintiffs' position in the instant case is that the termination clauses of both the contract and lease are clear and unambiguous. Furthermore, plaintiffs' proof regarding the inducing representations of the collateral agreements attack the heart of these termination clauses because that proof would specifically contradict or vary those clauses. Plaintiffs have not cited one Tennessee case in which a party was prevented from using a specifically bargained-for termination clause to conclude a business relationship between the parties. Plaintiffs' position is further eroded by the fact that the contract contains not one, but two, integration clauses which indicate that the contract was the "entire understanding" between plaintiffs and RPI [*see* Doc. 14, Ex. 2 to Ex. A, p. 16]. One of those integration clauses requires that all further changes must be "in writing" [*see id.*, p. 17]. Plaintiffs, in effect, ask this court

to disregard three separate provisions of the contract (two integration clauses and the termination clause) and one provision of the lease (the termination clause) and consider this parol evidence.[13] Nevertheless, the court concludes that, under the law of Tennessee, the parol evidence rule, a rule of substantive law, clearly prohibits the introduction of any such evidence which contradicts and varies completely the 30–day termination provision of the contract and lease between the parties. Consequently, none of plaintiffs' fraud-based causes of action can survive without this evidence. Nor can plaintiffs' action for breach of contract which is totally dependent on allegations of fraud.

## VI.

### *Tennessee Consumer Protection Act (TCPA)*

■ In paragraphs 37 through 41 of the complaint, plaintiffs allege that RPI violated the TCPA. The TCPA grants a private right of action to consumers who suffer a loss due to "unfair or deceptive acts or practices" as defined in the Act. T.C.A. § 47–18–109. The TCPA enumerates certain acts or practices which are considered deceptive, including "[r]epresenting that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve … [.]" T.C.A. § 47–18–104(12). The TCPA also prohibits "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person." T.C.A. § 47–18–104(27). It must be noted too that the Act defines "trade," "commerce," and "consumer transaction" as "the advertising, offering for sale, lease or rental … of any goods, services, property, tangible or in-

---

**13.** This is in addition to asking the court to ignore the contract's "No Franchise" provi-

sion, as well as the prefatory language of that contract.

tangible, real, personal, or mixed ... [.]" T.C.A. § 47–18–103(9).

Based on the above statutory framework, plaintiffs contend that they have presented evidence that RPI made fraudulent representations that it would not terminate its lease agreement with plaintiffs except for poor performance or other good cause and that those representations and assurances induced the plaintiffs to enter into the lease and contract with RPI. Similarly, plaintiffs contend that the statements made by RPI's agents constitute a representation that the lease and the contract involved rights or obligations that they did not in fact possess, *i.e.*, the assurance of RPI not to terminate the lease agreement without cause.

In the court's view, however, the insurmountable obstacle inherent in the surviving cause of action under the TCPA is that the court, having dismissed all of plaintiffs' fraud-based and breach of contract claims, cannot allow this cause of action to stand when the only remaining allegation is that RPI simply utilized the clear language of the contract and lease to terminate the contract and the lease. In other words, the court has concluded as a matter of law that a valid contract and lease existed between the parties and that RPI properly employed the termination clause to end the parties' relationship. It would be totally inconsistent to then hold that RPI willfully and knowingly engaged in the use of deceptive or unfair acts to entice plaintiffs to execute those documents. *See Brandel v. Moore Mortgage and Investment Co.*, 774 S.W.2d 600, 607 (Tenn.Ct. App.1989) (Where valid contract existed between parties based on language of the contract, there was no false representation existing; thus, there could be no action under the TCPA). If this court had determined that one of plaintiffs' other causes of action was viable, then perhaps plaintiffs' cause of action under the TCPA might

survive as well. Because there is no recognizable fraud in this case, RPI's utilization of the termination clause to end the parties' business relationship does not provide a separate fraud-based cause of action under the TCPA.

## VII.

### *Non–Disclosure*

During argument, the court, *sua sponte*, raised an issue as to whether RPI had a duty to disclose to plaintiffs that it might sell the property at some time in the future and that it had been trying to sell the property in the past. The court therefore requested the parties to brief that issue, and they have now done so [*see* Docs. 59, pp. 2–8, and 62, pp. 5–12].

 Tennessee law recognizes that non-disclosure will give rise to a claim for fraud when the defendant has a duty to disclose and when the matters not disclosed are material. *Dobbs*, 846 S.W.2d at 274 (citations omitted). If the court assumes that the matters not disclosed in the instant case are material, the question then becomes whether RPI had a duty to disclose the fact that it might sell this property in the future, even perhaps in the very near future. In Tennessee, a duty to disclose arises when: (1) there is a previous definite fiduciary relationship between the parties; (2) where it appears one of the parties to the contract expressly reposes a trust and confidence in the other; and (3) whether the contract or transaction is intrinsically fiduciary and calls for perfect good faith, *i.e.*, a contract of insurance. *See Justice v. Anderson County*, 955 S.W.2d 613, 616–17 (Tenn.Ct.App.1997); *see also Domestic Sewing Machine Co. v. Jackson*, 83 Tenn. 418, 424–25 (1885).

 Here, the record reflects that the contract and lease were arms-length transactions and that there was absolutely no

fiduciary relationship between the parties. Nor does the record support a finding that plaintiffs reposed a trust and confidence in the defendant. To the contrary, while plaintiffs were asking the questions about the circumstances under which the termination clauses could be invoked, plaintiffs were also undertaking independent research to determine the circumstances under which RPI might terminate its lease with a contract operator. Finally, there is no proof whatsoever to suggest that this contract and lease are intrinsically fiduciary, thereby calling for perfect good faith. Plaintiffs have therefore failed to meet the criteria required to demonstrate that they are entitled to relief for fraudulent concealment or failure to disclose known facts.

Additionally, the court will take its analysis one step further. It is extremely significant to the court that at no time during the two months of negotiations did plaintiffs ask RPI or any of its agents whether raceway 773 had been for sale, or whether it might be in the foreseeable future. This issue was simply not broached, so that RPI did not withhold information which was directly requested. Hence, this case does not involve a situation in which RPI's silence amounted to some sort of fraud. This is especially true because RPI did not engage in any act intended to exclude suspicion and prevent inquiry. To the contrary, RPI encouraged plaintiffs to check with other contract operators, and they did so. The court concludes that RPI did not have a duty to disclose under the facts of this case.

## VIII.

### Conclusion

Plaintiffs and RPI executed a contract and lease, each of which clearly stated that *either party* had the right to terminate upon 30–days notice to the other. From the outset, plaintiffs were concerned about the circumstances under which these termination clauses might be triggered. At no time did plaintiffs misunderstand this language—they knew exactly what it said.

Wisely, plaintiffs attempted to convert this one-year lease into a five or ten-year lease. RPI rejected that notion. Plaintiffs were put on notice at that point that RPI was insistent that the 30–day termination clause be included in the contract and lease. Plaintiffs were likewise put on notice that the clause might be utilized. Had plaintiffs retained legal counsel at that juncture, perhaps negotiations could have been undertaken whereby a liquidated damages provision could have been included in the contract for plaintiffs' protection. Or perhaps their counsel would have discovered, as did their present trial counsel, that RPI had utilized the 30–day termination clause to "kick out" other contract operators. Nevertheless, plaintiffs agreed to enter into this contract and lease, still troubled while the documents were being executed, that this 30–day termination clause might be invoked. Not surprisingly, RPI, almost 14 months later, employed that clause when it sold Raceway 773. Plaintiffs gambled on a long-term relationship with RPI, while the documents they executed allowed for much less. Tennessee law mandates that the court avoid the wholesale rewriting of the contract and lease and enforce these documents as executed by the parties pursuant to their precise provisions. Having said that, the court must grant defendant's motion for summary judgment in its entirety.

Order accordingly.

### ORDER

For the reasons set forth in the Memorandum Opinion this day passed to the Clerk for filing, it is hereby ORDERED that defendant's motion to dismiss or, in the alternative, for summary judgment [Doc. 14] be, and the same hereby is,

GRANTED whereby summary judgment is entered in favor of defendant as to all causes of action brought by plaintiffs in their second amended complaint. Consequently, defendant's motion for summary judgment on punitive damages [Doc. 38] and its motion for summary judgment on limiting damage proof [Doc. 58] are hereby DENIED AS MOOT.