IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 6, 2018 Session

## JAMES NATHAN MITCHELL v. ELECTRIC EMPLOYEES' CIVIL SERVICE AND PENSION BOARD OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE

**Appeal from the Chancery Court for Davidson County
No. 16-649-II     William E. Young, Chancellor**

_____

### No. M2018-00186-COA-R3-CV

_____

An employee of Nashville Electric Service ("NES") was terminated in 2015 due to false and misleading information he provided on his initial application for employment nine years earlier, in 2006. NES did not discover that the information was false until the employee submitted an application for promotion in 2015 and one of his supervisors noticed a discrepancy between the two applications. NES provided the employee with a due process hearing and a hearing by an administrative law judge before the Electric Employees' Civil Service and Pension Board of the Metropolitan Government of Nashville and Davidson County ("the Board"), which voted to terminate his employment. The employee filed a petition for judicial review of the Board's decision, which the chancery court affirmed. On appeal to this Court, we affirm the trial court's judgment upholding the Board's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which RICHARD H. DINKINS and W. NEAL MCBRAYER, JJ., joined.

W. Carl Spining, Nashville, Tennessee, for the appellant, James Nathan Mitchell.

Robert W. Horton, Nashville, Tennessee, for the appellee, Electric Employees' Civil Service and Pension Board.

# OPINION

## I.  FACTUAL AND PROCEDURAL BACKGROUND

James Nathan Mitchell was an NES employee from 2006 until 2015, when NES preferred charges against him for providing false and misleading information on his initial employment application in 2006.  Mr. Mitchell first submitted an application to work at NES as a meter reader on December 11, 2006.  In the "Employment Record" section of the application, Mr. Mitchell indicated that he had worked for Purity Dairies from September 1998 to October 2002.  He stated that he left Purity Dairies due to "pay cuts and policy changes."  The application contained a statement that read:  "The information herein furnished is true and correct to the best of my knowledge and belief, and I am aware that should investigation show any falsification, I will not be considered for employment or, if employed, I will be dismissed."  Mr. Mitchell signed his name immediately below this statement.

NES hired Mr. Mitchell to work as a meter reader in the first quarter of 2007.  Mr. Mitchell was promoted to Storekeeper I in 2008 and to Storekeeper II in 2010.  In February 2012, Mr. Mitchell applied for a promotion to Storekeeper III.  He was not promoted in 2012 and applied for this position again in June 2015.  Mr. Mitchell filled out an online application in 2012 and 2015, and on both of these applications he indicated that he had been "terminated" from Purity Dairies.  The explanation Mr. Mitchell gave for his termination was "Vehicle Accedent [sic] Zero tolerance policy."  A staffing specialist at NES noticed the discrepancy between Mr. Mitchell's 2006 and 2015 applications and reported this to her supervisor.  The Vice President of Human Resources and Corporate Services concluded that termination charges should be preferred against Mr. Mitchell based on the discrepancy between his initial application and his later applications for promotion.

The President and Chief Executive Officer of NES conducted a due process hearing on July 7, 2015, and at the end of the hearing he concluded that management met its burden of proving that Mr. Mitchell had provided false information on his initial employment application.  Mr. Mitchell was then suspended without pay pending disposition of the charges by the Board.  The Board referred the charges to an administrative law judge ("ALJ"), who held a hearing on December 18, 2015, and wrote a report recommending that NES's charges of termination of Mr. Mitchell's employment be approved.

<u>Hearing before the ALJ</u>

The ALJ heard live testimony and made the following factual findings, *inter alia*:

5. On January 22, 2007, NES completed its background investigation of Mr. Mitchell. The investigation included a Department of Motor Vehicles search that apparently went back five years and included a Report from the State of Tennessee, Department of Safety, which contained one motor vehicle related citation: On December 2, 2004, Mr. Mitchell was cited for "MAKING IMPROPER TURN."

6. On March 2, 2007, NES hired Mr. Mitchell as a Meter Reader Trainee.

7. On June 13, 2007, Mr. Mitchell was involved in an at-fault motor vehicle accident while driving an NES truck in a parking lot and was disciplined with a "First Offense – Written Notice."

8. On August 29, 2007, Mr. Mitchell was unanimously recommended to be retained as an NES employee and granted Civil Service Status.

9. From June 4, 2008, through June 23, 2015, Mr. Mitchell received annual performance reviews, rating him as follows:

| | |
|---|---|
| 2008 Good | 2012 Outstanding |
| 2009 Very Good | 2013 Outstanding |
| 2010 Very Good | 2014 Very Good |
| 2011 Very Good | 2015 Very Good |

10. Between 2008 and 2015, Mr. Mitchell applied for promotion several times. Two of those times, in 2012 and 2015 respectively, were specifically raised by NES as presenting issues at the hearing.

11. On February 20, 2012, Mr. Mitchell was considered for a promotion for which he applied for the position of Storekeeper III. He was not hired for the position.

12. In seeking the 2012 promotion, Mr. Mitchell had to complete an online application form. The 2012 online application stated the following regarding the reason for leaving Purity Dairies:

Reason for Leaving: Terminated

Explanation: Vehicle Accedent (sic) Zero tolerance policy

. . . .

14. In reviewing the 2015 online application, Pat Greer, a Staffing Specialist for NES, noticed discrepancies between Mr. Mitchell's initial job application and the 2015 online application. Specifically, Ms. Greer noticed that Mr. Mitchell's stated reason for leaving his employment with Purity Dairies on his initial application was due to "Pay cuts and policy changes." However, on the 2015 application, Mr. Mitchell stated his employment with Purity was "terminated" because he "violated the company's zero tolerance vehicle accident policy."

. . . .

26. In this case, Mr. Mitchell denied that he intended to misrepresent anything to NES.

27. Mr. Mitchell testified that when he completed the 2015 online application for a promotion, he did not refer back to his initial paper NES application. . . .

28. Regarding his previous employment with Purity Dairies, Mr. Mitchell testified that ownership there changed during his tenure. As a result, a few things changed, including route changes and pay structure, which included less pay for his particular position, and new management implemented a zero-tolerance accident policy. Mr. Mitchell acknowledged having a single-vehicle at-fault accident after he fell asleep at the wheel while working at Purity Dairies. He explained that after the accident, he was called into the office by a manager and that he quit before he could be terminated.

His testimony varied on this point:

> [The route manager said] Hey, so let's talk about this at-fault vehicle accident that you had. I said, Yeah. And he went on to talk about the policies that Dean Foods had set in place, that it was a pretty bad wreck. Even though nobody else was involved, there was some pretty significant damage to the truck that I wrecked. I saw where the conversation was going, and I just basically told him, Look, I'm not real happy here, and you know that I'm not real happy here. You know a lot of these extra guys are not real happy around here. I know where this conversation is going, so let's just save each other another 30 minutes of going back and forth. I appreciate the opportunity that I have had, but I'm going to have to take off.

- 4 -

And I dismissed myself from the meeting, and that was the extent of it.
He called my immediate supervisor that worked under him over [to] me, and he escorted me back up to the dock. I got my personal items out of my truck, and we walked to the parking lot, and that was it.

. . . .

To this day, I really don't know if I was terminated from Purity or if I quit Purity or if I resigned from Purity if I was forced to resign. It's a gray area. I never talked to them. They never talked to me. So do I consider myself terminated or not? I guess it just depends on time.

Q. So once you were called into the office and you had this conversation with —was it a manager?

A. He was the route sales manager, yes, ma'am.

Q. And did he say you're terminated?

A. At no point during the conversation did he specifically say to me you are terminated. But I could tell that the conversation was building quickly to that point.

Q. So did you quit? Is it your position that you quit?

A. To this day, I don't know. I don't have a position. That's -- the age-old question is did you quit before they fired you, or did you get fired?

. . . .

Q. So because of the vehicle accident, you quit; your employment terminated with Purity?

A. My employment terminated a lot sooner than I would have expected because of the at-fault vehicle accident. Would I still be at Purity this day? No, ma'am, I would not.

29. Mr. Mitchell asserted that during his initial interview with Tyler Mills in 2006, he explained to Mr. Mills that he had an at-fault accident while working at Purity Dairies.

30. Tyler Mills, Mr. Mitchell's previous supervisor, testified at the trial in this case. Mr. Mills recently retired from NES after 57 years of service. Mr. Mills remembered Mr. Mitchell and testified that he was a good employee who never presented any problems.

31. Mr. Mills acknowledged interviewing Mr. Mitchell in 2006 for the meter reader position and did not remember whether Mr. Mitchell told him that he had been terminated from his employment at Purity Dairies or about having an accident while working for Purity Dairies. Mr. Mills further testified that it would not have mattered if Mr. Mitchell had been terminated by a previous employer, but if Mr. Mitchell had mentioned having an accident, Mr. Mitchell would not have been hired at NES.

> Q. Mr. Mills, you mentioned that you interviewed Mr. James Nathan Mitchell for the position of meter reader, right?
>
> A. Yes.
>
> . . . .
>
> Q. And in that interview, you asked him about Purity Dairies. Would you agree to that?
>
> A. We talked. Yes, we did ask him about previous work, and it was with Purity Dairies.
>
> Q. Did he tell you that he was terminated from Purity Dairies?
>
> A. I don't remember if he told me he was terminated or not. I really don't.
>
> . . . .
>
> Q. Do you think you would remember if someone told you during an interview that they had been terminated from previous employment?

A. In some cases, but I don't remember whether he -- whether James told me that he had been terminated or not. But we spoke of his past job, which was with Purity Dairies.

Q. But what I'm asking is if someone told you something like they had been terminated, would you consider that a good thing or a not-so-good thing?

A. Well, that would -- in some cases would be a good thing, or it could be either way.

Q. Okay. So if an employee -- or Mr. Mitchell is interviewing for a meter reader position, if he told you that he was terminated for having a vehicle accident, what would you consider that information?

A. Well, back then, we were very strict on safety. If I had been told he had had a vehicle accident in an interview, then he would not have been hired.

Q. And –

A. Because of the safety record, our manager wouldn't allow us to hire a person like that because we've had to not hire people in the past for that same reason.

(Citations to the record omitted.)

Rule 9.03 of the Board's rules that apply to NES employees ("Rule 9.03") states as follows:

Disciplinary action up to and including discharge may be taken for insubordination, improper conduct, inefficient work performance, habitual tardiness, absenteeism, or for other causes when it is determined to be in the best interest of [NES]. Discharge may occur only after charges have been filed and a hearing before the Board.

The Charter for the Metropolitan Government of Nashville and Davidson County ("the Charter") provides at Appendix 3, Article 43, paragraph 12:

No employee of the electric power board of the metropolitan government, except temporary employees and provisional employees, shall be discharged, suspended for more than ten (10) days nor oftener than twice in

any twelve (12) months, or otherwise punished except for just cause and after the filing of charges and trials . . . .

The ALJ considered whether NES had "just cause," as that phrase is used in Appendix 3, Article 43, paragraph 12 of the Charter, to discharge Mr. Mitchell from his employment at NES. The ALJ found that NES proved by a preponderance of the evidence that the explanation Mr. Mitchell provided on his 2006 job application for leaving Purity Dairies was "not completely truthful." As the ALJ noted, "Mr. Mitchell acknowledged that he omitted the principal reason he left Purity Dairies: that he had an at fault accident at work." The ALJ explained further:

> As to his "reason for leaving," Mr. Mitchell asserts that he was upset about the changes in policies at Purity Dairies, but acknowledges that the precipitating cause of his departure from Purity Dairies was his at-fault accident. Thus, while his statement on his initial application had a grain of truth, any fair reading of his own testimony demonstrates that the reason he left Purity Dairies when he did was due to the at-fault accident. Whether he was fired or quit, the at-fault accident was the reason for his leaving that employment at the time that he did.

The ALJ then concluded that NES failed to prove by a preponderance of the evidence that NES would not have hired Mr. Mitchell had he provided a fully accurate explanation for why he left Purity Dairies.[1] Finally, the ALJ addressed Rule 9.03, which it described as the "general dismissal rule" and found that this rule "gives NES broad discretion to terminate Mr. Mitchell if such dismissal is due to 'improper conduct' or is in NES's 'best interests.'" The ALJ found that "[i]t is certainly up to the Board of NES to decide whether it is in the best interests of NES to terminate Mr. Mitchell in this case" and that "[t]he policy decision of how best to implement the discretion granted the Board in Rule 9.03 is legitimately up to the Board." Thus, the ALJ recommended that NES management's charges of termination of Mr. Mitchell's employment be approved. Mr. Mitchell appealed the ALJ's decision to the Board, which voted to uphold the ALJ's recommendation to terminate Mr. Mitchell's employment.

Hearing before the Board

Mr. Mitchell filed an appeal of the ALJ's recommendation with the Board, and the Board held a hearing on April 27, 2016, during which it heard oral argument from Mr. Mitchell's and NES management's attorneys. Following the argument, the Board

---

[1]The ALJ reached this conclusion based on evidence that Mr. Mitchell had had an at-fault accident while he was a probationary employee at NES and that NES retained him despite this and granted him civil service status.

- 8 -

members upheld the ALJ's recommendation by a vote of four to one.  One of the Board members explained his reasoning as follows:

> He's obviously been, by all accounts a very good employ[ee], third generation, been here a long time. I know his livelihood is at stake here, it's in the balance, and I appreciate that. But the veracity of an application for -- to work here at NES is critical to the integrity of our hiring process, and I do believe that materiality is a factor. I think it is a consideration we have to think about. I think it's hard for us to measure that in a limited time in front of this hearing without hearing the testimony, so I rely a great deal on the fact-finders that have come before us through the process, including the ALJ.
>
> I do believe that there is a difference between saying I was terminated for policy changes and pay cuts versus being terminated or quitting in the face of certain termination. It's a little difficult for me to think that that was accidental or unintentional.  He may have thought it was immaterial, but I think it was -- it's hard for me to think it was unintentional. I think it's difficult for us to say in retrospect had he said this, this is what would have happened or we wouldn't have hired him. I don't know.
>
> But -- but it was a misrepresentation. It has been found to be material. I think that it is concerning that he was employed here for a good bit of time and an employee before we -- before it came up and -- and before we exercised this remedy, but I do think it's true and I think Ms. Steward says and I agree with her that, you know, if we -- if we can't withhold -- if we can't hold up the integrity of the application process and someone thinks they could mislead and get in and just hang on and hope nobody finds out, it -- it leads to a potential -- potential other problems down the road.
>
> And so as difficult as this is, as much as I hate for him -- because obviously he's been a good employee, I -- I move that we withhold -- we uphold the termination.

As reflected above, the Board rejected the ALJ's determination that Mr. Mitchell's accident while employed by Purity Dairies, and his nondisclosure of this on his 2006 application form, were not material to NES's decision to hire him.

Mr. Mitchell filed a petition with the chancery court seeking judicial review of the Board's decision.  In a Memorandum and Order filed on January 8, 2018, the chancery court upheld the decision of the Board.  The court found that there was substantial and

material evidence to support the Board's decision to terminate Mr. Mitchell's employment because Mr. Mitchell did not truthfully and forthrightly explain on his initial employment application why he left Purity Dairies; that Mr. Mitchell's termination was not based on an unlawful procedure; and that terminating Mr. Mitchell's employment was not arbitrary or capricious under the circumstances, where NES had a goal of maintaining the integrity of its hiring process.

Mr. Mitchell now appeals the Board's decision terminating his employment to this Court pursuant to Tenn. Code Ann. § 4-5-322. He argues that the Board's decision to terminate his employment was (1) unsupported by substantial and material evidence, (2) made upon unlawful procedure, and (3) arbitrary and capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion.

## II. STANDARD OF REVIEW

NES is governed by the Charter, which created the Board. Metro Charter, App. 3, Art. 43, ¶ 1. The Board is an agency of the metropolitan government, and the Charter gives the Board authority to promulgate rules applicable to NES employees. Metro Charter, App. 3 (editor's note), and Art. 43, ¶ 2. This contested case must be decided in accordance with the Uniform Administrative Procedures Act, specifically Tenn. Code Ann. §§ 27-9-114 and 4-5-322.

Trial and appellate courts follow the same standard of review. *Martin v. Sizemore*, 78 S.W.3d 249, 275-76 (Tenn. Ct. App. 2001). A court reviewing an agency decision may affirm or remand the decision for additional proceedings. Tenn. Code Ann. § 4-5-322(h). The reviewing court may also reverse or modify the decision if the court determines that the petitioner's rights have been prejudiced because the agency's findings, inferences, conclusions, or decisions are:

> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

*Id.*

Courts are not to reverse an agency decision just because the evidence could support a different result. *City of Memphis v. Civil Serv. Comm'n of the City of Memphis*, 238 S.W.3d 238, 243 (Tenn. Ct. App. 2007) (citing *Martin*, 78 S.W.3d at 276); *see also Metro. Gov't of Nashville & Davidson Cnty. v. Tenn. Solid Waste Disposal Control Bd.*,

832 S.W.2d 559, 561 (Tenn. Ct. App. 1991). A court may reverse an agency decision "only if a reasonable person would necessarily arrive at a different conclusion based on the evidence." *City of Memphis*, 238 S.W.3d at 243 (citing *Martin*, 78 S.W.3d at 276).

III. ANALYSIS

A. <u>Substantial and Material Evidence</u>

To determine whether evidence is "substantial," the reviewing court "shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." Tenn. Code Ann. § 4-5-322(h)(5)(B); *see also City of Memphis*, 238 S.W.3d at 243; *McClellan v. Bd. of Regents of State Univ.*, 921 S.W.2d 684, 693 (Tenn. 1996) (citing *Humana of Tenn. v. Tenn. Health Facilities Comm'n*, 551 S.W.2d 664, 667 (Tenn. 1977)). A reviewing court's standard of review is "narrow and deferential." *Miller v. Gywn*, No. E2017-00784-COA-R3-CV, 2018 WL 2332050, at *2 (Tenn. Ct. App. May 23, 2018) (citing *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 279 (Tenn. Ct. App. 1998)).

"Substantial and material evidence is 'such relevant evidence as a reasonable mind might accept to support a rational conclusion' and to furnish a reasonably sound basis for the decision under consideration." *City of Memphis*, 238 S.W.3d at 243 (quoting *City of Memphis v. Civil Serv. Comm'n of City of Memphis*, 216 S.W.3d 311, 316 (Tenn. 2007)). The substantial and material evidence standard requires proof beyond a mere "scintilla or glimmer," but less than a preponderance of the evidence. *Beal v. Nashville Elec. Serv.*, No. M2009-01604-COA-R3-CV, 2010 WL 4272696, at *11 (Tenn. Ct. App. Oct. 28, 2010) (citing *Dickson v. City of Memphis Civil Serv. Comm'n*, 194 S.W.3d 457, 464 (Tenn. Ct. App. 2005); *Mosley v. Tenn. Dep't of Commerce & Ins.*, 167 S.W.3d 308, 316 (Tenn. Ct. App. 2004)).

NES preferred charges against Mr. Mitchell for providing false and misleading information on the employment application he submitted in 2006. Mr. Mitchell argues on appeal that the information he included on his application was not false; he contends he left Purity Dairies because of the change in policy regarding at-fault motor vehicle accidents and because of lower wages. Mr. Mitchell further argues that Tyler Mills, who interviewed him for the NES meter reading position in 2006, was aware of Mr. Mitchell's at-fault accident at Purity Dairies and recommended that he be hired anyway.

We understand Mr. Mitchell's argument to be that before the change in policy occurred at Purity Dairies, there was not a zero tolerance policy in place, and Mr. Mitchell may not have been at risk of losing his job as a result of his at-fault accident in 2002 if the policy had not changed before he had his accident. Mr. Mitchell conceded at the hearing before the ALJ, however, that if he had not had the at-fault accident, his

employment at Purity Dairies would not have ended when it did.  Mr. Mitchell testified as follows:

> Q:  So because of the vehicle accident, you quit; your employment terminated with Purity?
>
> A:  My employment terminated a lot sooner than I would have expected because of the at-fault accident.

We disagree with Mr. Mitchell's representation that Mr. Mills was aware of Mr. Mitchell's at-fault accident at Purity Dairies and recommended that he be hired anyway.  Our review of Mr. Mills' testimony before the ALJ reveals that Mr. Mitchell mischaracterizes Mr. Mills' testimony.  Contrary to Mr. Mitchell's representation, Mr. Mills testified that he and Mr. Mitchell did not discuss accidents during Mr. Mitchell's interview.  During his direct examination, Mr. Mills explained that "we were very strict on safety.  If I had been told he had had a vehicle accident in an interview, then he would not have been hired."  Mr. Mills reaffirmed this on cross-examination: "[T]he reason that I don't think we discussed [Mr. Mitchell's at-fault accident] is because if I had known he had had accidents - - we would not have put him on the list to be hired had I known about that."

The ALJ found Mr. Mills' testimony was "not credible" in part because Mr. Mitchell caused an at-fault accident during his probationary period at NES and this did not result in Mr. Mitchell's termination.[2]  However, as the trial court wrote,

> In his analysis, the ALJ failed to take into account the different perspective an employer would have in its dealings with an already-hired, probationary employee invested with three-months-worth of training — an employee who purportedly had a clean driving record when hired — versus an applicant who disclosed an at-fault accident with a prior employer. Creating a false equivalency between two such persons leads to the unlikely conclusion that NES did not care whether applicants for driving jobs had clean driving records.  This conclusion is belied by NES's apparent practice of obtaining Department of Motor Vehicles records on driver applicants.

The trial court also determined that the Board considered and then rejected the ALJ's conclusion that Mr. Mitchell's at-fault accident at Purity Dairies was not material to NES's hiring decision.  According to the trial court,

---

[2] The record shows that the accident Mr. Mitchell had while a probationary employee at NES was extremely minor, occurred in a parking lot, and did not require a significant repair of the NES vehicle.

[A]n applicant for a driver's position who has previously worked as a driver surely has an advantage in the hiring process. Revealing an at-fault accident at a prior job would take away this advantage, potentially making the applicant less desirable than someone with no driving experience at all. Such information cannot reasonably be deemed "immaterial."

The Board is not bound to accept the ALJ's determination. *McEwen v. Tenn. Dep't of Safety*, 173 S.W.3d 815, 822 (Tenn. Ct. App. 2005). As the *McEwen* Court explained,

> Because an agency possesses its own fact-finding authority, it may make its own factual determinations, and it may substitute its judgment for that of the hearing officer or administrative judge. Thus, when an agency reviews an initial order, it renders its own decision, and it is the agency's final order, not the initial order, that is the subject of judicial review.

*Id.* (citations omitted). Moreover, an agency is not bound by an administrative law judge's credibility determinations; it is able to make its own independent credibility determinations even without hearing live testimony. *Id.* at 823; *see also Sanderson v. Univ. of Tenn.*, No. 01A01-9607-CH-00289, 1997 WL 718427, at *5 (Tenn. Ct. App. Nov. 19, 1997) (noting that "the person or entity making the final agency decision may, but is not required to, defer to a hearing officer's findings") (citing *United States v. Raddatz*, 447 U.S. 667, 680 (1980)). "[D]ue process does not require the decision maker to observe the witnesses testify and . . . there is 'broad discretion to accept, reject, or modify the [fact finder's] findings.'" *Sanderson*, 1997 WL 718427, at *5 (quoting *Raddatz*, 447 U.S. at 680). Although agencies, such as the Board, should give "appropriate deference" to an administrative judge's credibility determinations because of his or her opportunity to observe a witness's demeanor first-hand, "only demeanor-based credibility determinations are entitled to special deference." *McEwen*, 173 S.W.3d. at 823. Thus, "[i]f credibility is not a central ingredient of the agency's decision, then the . . . administrative judge's credibility determinations are not very significant." *Id.* at 824.

The ALJ's determination that Mr. Mills was not credible was not based on his demeanor; instead, it was primarily based on the ALJ's reasoning that NES would not have retained Mr. Mitchell after he had an at-fault accident during his probationary period at NES if Mr. Mitchell's driving record had been so important. As a result, there was no reason for the Board to give the ALJ's credibility determination special deference. Reviewing the record as a whole, we find it contains substantial and material evidence to support the Board's decision to terminate Mr. Mitchell's employment because Mr. Mitchell was not truthful and forthright about the reason he left Purity Dairies.

B.  Unlawful Procedure

Mr. Mitchell next contends that the decision by NES to terminate him was based on unlawful procedure.  The Charter authorizes, empowers, and directs the Board "to make all reasonable rules as it may deem necessary" to govern NES employees, "expressly including the right to make all necessary and proper rules as to employment, discharge, compensation and classification . . . ."  Metro Charter, App. 3, Art. 43, ¶ 2. The parties agree that the Board has adopted Civil Service Rule 9.03, which authorizes the Board to discharge an employee when it is in NES's "best interest."  Mr. Mitchell argues that this rule applies only to NES employees, not to those applying to become employed, as he was in 2006.  However, Mr. Mitchell was an active employee by the time NES took disciplinary action against him, and Rule 9.03 expressly gives NES the right to discharge employees if and when it determines that the discharge is in its "best interest."  Courts are directed to "give great deference and controlling weight to an agency's interpretation of its own rules."  *Jackson Express, Inc. v. Tenn. Pub. Serv. Comm'n*, 679 S.W.2d 942, 945 (Tenn. 1984).  We also note that the application for employment that Mr. Mitchell signed in 2006 cautioned that he could be dismissed if an "investigation [should] show any falsification" of any information he furnished on the application.

As discussed above, Appendix 3, Article 43, paragraph 12 of the Charter requires NES to have "just cause" before terminating an employee:

> No employee of the electric power board of the metropolitan government, except temporary employees and provisional employees, shall be discharged, suspended for more than ten (10) days nor oftener than twice in any twelve (12) months, or otherwise punished except for just cause and after the filing of charges and trials . . . .

Mr. Mitchell neither addresses this aspect of the Charter nor argues that NES did not have just cause to discharge him.  This court addressed the meaning of "just cause" in the context of determining whether a civil service employee's job was properly terminated in *Knoxville Utilities Board v. Knoxville Civil Service Merit Board*, No. 03A01-9301-CH-00008, 1993 WL 229505 (Tenn. Ct. App. June 28, 1993), wherein we adopted the following standards:

> As a general rule, a civil service employee may be discharged or demoted on grounds, or for a cause. . . . The term "cause" implies good cause which must be substantial; but, any reasonable, sufficient cause may be ground for dismissal, and the power to discharge is not limited to specific grounds. The term "cause" is construed to mean some substantial shortcoming which renders continuance in office or employment in some way detrimental to

the discipline and efficiency of the service and something which the law and sound public opinion recognize as good cause for removal.

. . . .

Where lawful grounds for dismissal of a civil service employee exist, the character and work record of the employee involved is of no importance, and the fact that he has previously received a general rating of satisfactory does not bar his removal.

*Knoxville Utils. Bd.*, 1993 WL 229505, at \*10 (quoting 67 C.J.S. *Officers and Public Employees* § 132). Mr. Mitchell argues that he did not intend to mislead NES or to be untruthful on his initial application. However, it is not necessary to find that Mr. Mitchell intended to mislead NES or to be untruthful for NES to have "just cause" to discharge him. *See Biggs v. Reinsman Equestrian Prods., Inc.*, 169 S.W.3d 218, 221 (Tenn. Ct. App. 2004) (stating that just cause "does not require an element of intent").

Any action by an employee that injures or tends to injure the employer's "business, interests, or reputation will justify . . . dismissal. Actual loss is not essential; it is sufficient if, from the circumstances, it appears that the [employer] has been, or is likely to be, damaged by the acts of which complaint is made." *Brewer v. Coletta*, No. 02A01-9601-CH-00005, 1996 WL 732429, at \*3 (Tenn. Ct. App. Dec. 20, 1996) (No Tenn. R. App. P. 11 application filed); *Curtis v. Reeves*, 736 S.W.2d 108, 112 (Tenn. Ct. App. 1987).

*Lawrence v. Rawlins*, No. M1997-00223-COA-R3-CV, 2001 WL 76266, at \*5 (Tenn. Ct. App. Jan. 30, 2001).

As one of the Board members stated in explaining his vote to terminate Mr. Mitchell's employment, "[I]f we can't hold up the integrity of the application process and someone thinks they could mislead [NES] and get in and just hang on and hope nobody finds out, it - - it leads to a potential - - potential other problems down the road." We stated in *Knoxville Utilities Board* that "any reasonable, sufficient cause may be ground for dismissal, and the power to discharge is not limited to specific grounds." *Knoxville Utils. Bd.*, 1993 WL 229505, at \*10. Deferring to the Board's interpretation of its rules, as we must, we conclude that the Board did not improperly rely on Rule 9.03 to conclude that it was in NES's best interest to discharge Mr. Mitchell after discovering that he was not truthful and forthright in explaining on his initial application why he left Purity Dairies. In addition, we agree with the trial court that withholding material information on an employment application could have an adverse effect on an employer's interests and could undercut the effectiveness of its hiring decisions. The Board did not act

improperly in concluding that withholding such information constituted just cause for terminating Mr. Mitchell's employment.

C. Arbitrary and Capricious/Abuse of Discretion/Clearly Unwarranted Exercise of Discretion

A decision is arbitrary and capricious if it is not supported by substantial and material evidence. *City of Memphis*, 238 S.W.3d at 243. However, even in the face of sufficient evidentiary support, a decision may be arbitrary and capricious if the agency has made a "clear error of judgment." *Id.* "A decision is arbitrary or capricious if it 'is not based on any course of reasoning or exercise of judgment, or . . . disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion.'" *Id.* (quoting *City of Memphis*, 216 S.W.3d at 316.

Mr. Mitchell contends the Board's decision to terminate his employment was arbitrary and capricious because it was not supported by any specific evidence in the record. Mr. Mitchell makes no new arguments that he did not raise earlier in his brief. We have already addressed the evidence in the record that supports the Board's decision to discharge Mr. Mitchell and will not do so again here. Having already concluded that the record contains substantial and material evidence to support the Board's decision and that the Board did not follow any unlawful procedures in reaching its decision, we also conclude that the Board did not disregard any facts or circumstances of the case that would necessarily lead a reasonable person to reach a different conclusion. Mr. Mitchell fails to show that the Board made a clear error of judgment in terminating his employment. We hold that the Board's decision was not arbitrary or capricious and that it did not constitute an abuse of discretion or clearly unwarranted exercise of discretion.

IV. CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, James Nathan Mitchell, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE